16841

DAVENPORT v. WOODSIDE COTTON MILLS CO., INC.

(80 S. E. (2d) 740)

*Messrs. Rainey, Fant & Brawley,* of Greenville, *for Appellant,*

*Messrs. Leatherwood, Walker, Todd & Mann,* of Greenville, *for Respondent,*

March 9, 1954.

STUKES, Justice.

Respondent recovered verdict and judgment against appellant for $2,235.00 actual damages and $1,765.00 punitive damages; and the appeal is only from the court's refusal of motions to eliminate punitive damages. There is no appeal from the verdict and judgment insofar as the award of actual damages is concerned.

Respondent, a Negro, owned and operated a small farm near the town of Simpsonville, where appellant had a textile

plant. He mainly raised and sold hogs, of which he had a herd of about seventy-five in number. For years he had fed them garbage which he obtained from the town. The latter also deposited refuse on property of appellant, which became objectionable to neighboring residents and the town arranged with respondent to deposit its refuse in his hog pasture, which thereupon became the town "dump." Without respondent's consent, according to his contention which was sustained by the verdict of the jury, appellant also dumped its industrial waste in the pasture, including poisonous substances of which respondent's animals ate and died.

The nature of the appeal necessitates the consideration of the evidence in the light most favorable to respondent, for which there need be no citation of authority. If there was evidence from which the jury might reasonably infer willfullness, wantonness or recklessness, it was not error to submit the issue to the jury and likewise not error to deny appellant's motion for judgment notwithstanding the verdict for punitive damages.

In the light of the foregoing principles the evidence offered in behalf of respondent will be reviewed. He testified that his arrangement with the town was made with the Chief of Police (who also acted as Sanitation Officer) and he gave no permission to, and had no dealings with, appellant prior to the poisoning of his hogs. After the town commenced to dump its garbage in the pasture respondent observed appellant's trucks doing the same thing and, upon investigation, he found that appellant had deposited in his pasture resin, glue, dye, sizing and downflakes in large quantities. Entry into the pasture was through a gate on which there was a large "no trespassing" sign. Respondent had the sign placed on the gate because he did not want anyone to "dump" in the pasture except the town. On the day after the first deposit of refuse in the pasture by appellant, respondent found many of his hogs sick and some already dead. He made complaint to the policeman; and appellant's superintendent and also its "outside boss" promptly visited the respondent

and went to the hog pasture where they saw the hogs. They offered him the services of a veterinarian and said that they would have one come and investigate, which they did. Prior to this the hogs were healthy. The veterinarian came, as did again the "outside boss" of appellant. The latter said to respondent, quoting from the latter's testimony, "I'm sorry. This stuff came from the slasher room. These boys ought to have known not to haul this stuff out here. It's poison." The veterinarian examined the hogs and respondent removed those which were living from the pasture and put them in another enclosure where he could better look after them, and where they would not have access to the dump. However, all died except one. Included were ten brood sows, eleven gilts, fifty-four pigs and a boar, of the reasonable aggregate market value of $3,000.00. The policeman procured the county to ditch the land with a machine and cover the refuse; but appellant thereafter, within three weeks or a month, again dumped the "same stuff" in the pasture and respondent's boar broke out of his pen and got to it, as did his mule, and they died in a day or two. Respondent and his wife went to appellant's plant and talked to the superintendent who told them that calcium chloride would kill but he had not ordered any in several months; there was no denial by appellant's agents that they had dumped "stuff" from the mill into the pasture just before the hogs sickened and died; and respondent had never given permission to appellant to go upon the property, the permission having been given only to the town to dump garbage in the hog pasture. Respondent loaded on his wagon some of the contents of sacks, which his hogs were eating, and some unopened sacks, and hauled them out of the pasture, to the road near his house.

Respondent's wife testified and corroborated him, particularly as to the "no trespassing" sign on the pasture gate; the hogs began to get sick the day after appellant's truck first went into the pasture. The hogs enjoyed the powdered substance, some in bags, which looked like ashes,

lime or soda. Two or three weeks after the refuse had been covered by the bulldozer appellant again dumped, quoting this witness, "the same identical stuff" in the pasture, which the boar and the mule got to, and both died. The witness also testified concerning her visit with her husband to appellant's office and the conversation with the latter's superintendent who said that nothing had been dumped in the pasture that would kill the hogs unless it was calcium chloride, and there was none of that because he had not ordered any in some time. The town dumped in the pasture at least daily after they began but appellant's trucks did not start it until the latter part of September, immediately after which the hogs became sick, began to die, three or four at a time, maybe at two or three day intervals, and all were dead by the middle of December; she saw the hogs eating the powder which was said to be calcium chloride.

Respondent's neighbor, through whose yard access was had to the pasture gate, testified that appellant's trucks first went into the pasture in the latter part of September, in disregard of the "no trespass" sign on the gate; he saw the ashes-like substance in sacks, which also looked like nitrate of soda, and he saw it dumped there the second time, after respondent had complained and the mill hands had burnt off the place. Thereupon the witness notified respondent that more poison had been dumped in his pasture; he had seen respondent's hogs dead after eating the "stuff" which appellant's trucks had dumped. He saw the bags marked "Downflakes" on respondent's wagon. Respondent had never had trouble with his hogs before and people came from far and near to buy his pigs. The following is from the testimony of this witness: "When they first dumped * * * it out there in his pasture and his hogs died, then he made a complaint to the town and they sent a mill hand down there and burnt the stuff, covered up old waste, and thereafter they dumped in some more. * * * That's when I went to Davenport (respondent) and said they were dumping in some more poison."

The well-trained and experienced veterinarian, who was called by appellant after respondent's complaint to the policeman, testified that he met appellant's outside foreman at respondent's farm, and they carefully examined the hogs, some of which were already dead, and the symptoms, which the witness described, indicated that the trouble came from poison and not from contagious or infectious disease. This was explained by the witness to appellant's foreman who accepted the findings and did not think that a post mortem examination was necessary to support the opinion of the witness that the hogs had eaten something that was killing them. The witness examined the chemicals on the wagon, identified as calcium chloride and resin, which appellant's foreman said had come from its mill. The witness described the symptoms of cholera which were not present. He testified to his experience in administering a twenty per cent solution of calcium chloride to livestock intravenously, for acute calcium deficiency, which usually was successful, but in a good many instances fatal. Taken by mouth in enough quantity it is harmful to livestock. Calcium chloride is a calcium salt, similar to table salt which is sodium chloride, and produces salt poisoning of hogs, to which the symptoms of respondent's hogs were similar. It was the opinion of this witness that the hogs died from poisoning, similar to salt poisoning. Some weeks after the veterinarian's first visit to respondent's hogs, on which he was accompanied by appellant's foreman, he went back at the request of the town and accompanied by the policeman. Only three or four hogs were then living and the symptoms were about the same, none of which indicated disease. In so large a herd of hogs there would have been some, at least, with external symptoms of cholera, if that had been the cause. Unless hogs are inoculated against cholera it is dangerous to feed them uncooked garbage. (But, according to the witness, respondent's hogs did not die from cholera, but from poisoning.) The dates of the visits and examinations of this witness, the veterinarian, were October 9 and November 6.

The respondent also called as a witness the policeman who, for the town, had charge of the disposal of garbage. He said that it was formerly dumped on property of the appellant which was changed in the Spring of 1951 and the garbage was thereafter dumped in respondent's pasture until some time in the fall of that year. Upon respondent's complaint, the witness went to the "outside man" of appellant and they visited respondent's farm where they saw some sick hogs. Afterward he saw the sacks of "stuff" on respondent's wagon. He had the refuse in the pasture burned, with the help of appellant's "hands" whom the "outside man" took there. The witness also had a bulldozer cover some of the "stuff" in the pasture, as he did occasionally at the former dump. The witness would not say that he ever gave appellant permission to dump refuse in respondent's pasture; they never talked about that and the witness said he never gave it a thought. When property of appellant was used for the dump the mill hauled its waste there and the town truck took the garbage, which latter the town did to respondent's pasture after the arrangement with him, and the witness knew that appellant was doing the same thing, which began in the Spring of 1951, because he saw its truck there, quoting, "a time or two." Of the transaction with respondent, the witness testified: "We (He?) just said, 'bring the garbage down.' We didn't specify any amount or any place. I just asked about putting it down there and he said, 'All right. Put it there. Bring it on.'" When the witness was asked how long appellant continued to dump in respondent's pasture after his first complaint, the reply was, "We quit before Christmas, I'm pretty sure. Sometime late in the year." He did not recall the month in which the first complaint was made. "After December or thereabout", he said, a new dump site was obtained.

Appellant introduced evidence which was in conflict with that offered in behalf of respondent, which has been briefed above, including testimony of experts who did not see the sick or dead hogs or the alleged poisonous substances which

came from the mill, but sat through the trial, heard the testimony which has been recounted and answered hypothetical questions to the effect that in their opinions the hogs died of disease rather than poisoning. The issue thereabout was, of course, determined in favor of respondent by the verdict of the jury, as were such other issues of fact as were made by the evidence. It may be added that appellant's superintendent admitted in his testimony that appellant formerly used calcium chloride and, when discontinued, had a supply on hand in 100-pound paper bags which were dumped in respondent's pasture along with other waste; and one of appellant's expert witnesses testified that calcium chloride in large quantities would be harmful to animals.

No error is imputed to the court by reason of the instructions to the jury; indeed, the appeal record does not contain the judge's charge. It must, therefore, be assumed to have been fair and free from error.

In view of the unappealed verdict and judgment for actual damages it must be taken as determined that appellant deposited poison in respondent's pasture by driving its truck through the gate which bore a "no trespass" sign; and did so again after notice of the consequent disaster to respondent's hogs and after its own employment of, and consultation with, the veterinarian, and investigation of the premises. The repetition of the wrong standing alone, may fairly be said to have been wilful and wanton and in reckless disregard of respondent's rights, which justified the award of punitive damages against appellant.

Reference is had to the relevant cases which are collected in 8 S. C. Dig. 42 *et seq.,* Key 87 *et seq.,* Exemplary Damages. In the leading case of *Beaudrot v. Southern R. Co.,* 69 S. C. 160, 48 S. E. 104, 106, verdict of $1,016.66 was affirmed, where the actual damages were about $2.50, caused by wilful trespass and partial destruction of a small portion of a fence. In the opinion by Mr.

Justice Woods it was said: "Punitive damages have now come, however, to be generally, though not universally, regarded, not only as punishment for wrong, but as vindication of private right. This is the basis upon which they are now placed in this state. When this is once admitted, as indicated by Mr. Justice Jones, in *Dagnall v. Southern R. Co.* [*ante*], 69 S. C. 110, 48 S. E. 97, it logically follows that the plaintiff is entitled to such damages, when under proper allegations in an action of tort he proves a wanton, willful, or malicious violation of his rights. The question has really been settled in this state against the view of the defendant, by *Appleby v. South Carolina & G. R. Co.,* 60 S. C. [48] 56, 38 S. E. 237; *Brasington v. South Bound R. Co.,* 62 S. C. [325] 330, 40 S. E. 665; *Oliver v. Columbia, N. & L. R. Co.,* 65 S. C. 1, 43 S. E. 307; *Griffin v. Southern .R. Co.,* 65 S. C. 122, 127, 43 S. E. 445; and these cases have been recently reaffirmed in *Dagnall v. R. Co.,* 69 S. C. 110, 48 S. E. 97; and *Miller v. Railway Co.,* 69 S. C. 116, 48 S. E. 99."

The following is quoted from *Sample v. Gulf Refining Co.,* 183 S. C. 399, 410, 191 S. E. 209, 214: "While there is authority in other jurisdictions to the effect that the award of punitive damages rests in the discretion of the jury (17 C. J. 971), yet under the settled rule prevailing in this state punitive damages are awarded not only as punishment for a wrong, but also as vindication of private right, and when under proper allegations a plaintiff proves a wilful, wanton, reckless, or malicious violation of his rights, it is not only the right but the duty of the jury to award punitive damages. *Dagnall v. Southern R. Co.,* 69 S. C. 110, 48 S. E. 97; *Beaudrot v. Southern R. Co.,* 69 S. C. 160, 48 S. E. 106; *Wilcox v. Southern Ry. Co.,* 91 S. C. 71, 74 S. E. 122."

Another case of some relevancy because it upheld verdict for punitive damages for the allowance of a grass fire to spread to plaintiffs' land is *Anderson v. Atlantic Coast Line R. Co.,* 179 S. C. 367, 184 S. E. 164, 104 A. L. R. 406.

Appellant strongly relies upon *American Oil Co. v. Colonial Oil Co.,* 4 Cir., 130 F. (2d) 72, a case of entirely different facts, which orginated in this State and in which the right to the recovery of punitive damages was denied; but the following quoted rule deduced from it in 8 S. C. Dig. 44, 45, is authority for affirmance here: "Where a tort is committed deliberately, recklessly, or by wilful negligence, with a present consciousness of invading another's right or of exposing him to injury, under South Carolina law, the injured party is entitled to exemplary damages."

Appellant's argument upon the effect of the testimony overlooks the jury's function to pass upon the credibility of the witnesses. The following is quoted from the opinion in *Oakman Service Station v. People's Oil Co.,* 174 S. C. 517, 520, 178 S. E. 129, 130, which related to the right to the recovery of punitive damages: "In *Lower Main Street Bank v. Caledonian Insurance Co.,* 135 S. C. 155, 133 S. E. 553, 555, it is said: 'The well-established rule in this state is that if there is any testimony whatever to go to the jury on an issue involved in a cause, or even if more than one inference can be drawn from the testimony, then it is the duty of the judge to submit the cause to the jury. This is true, even if witnesses for the plaintiff contradict each other, or if a witness himself in his testimony makes conflicting statements. The credibility of witnesses is entirely for the jury. On a motion for a directed verdict, the evidence in the cause must be considered most favorably to the plaintiff.' "

The former decisions of this court which were cited in the brief and additional memorandum of appellant have been carefully examined and we think that none is authority for reversal of the judgment under review.

Affirmed.

BAKER, C. J., and TAYLOR and OXNER, JJ., concur.

GRENEKER, Acting Associate Justice, disqualified.