529 S.E.2d 528

John Kevin CLARK and Maggie Lee Anderson, Respondents,

v.

Annette Rochelle CANTRELL, Petitioner.

No. 25088.

Supreme Court of South Carolina.

Heard Feb. 15, 2000.
Decided March 13, 2000.

372

Jack D. Griffeth and Scott Boatwright of Love, Thornton, Arnold & Thomason, P.A., of Greenville, for petitioner.

J. David Standeffer and James Brislane of Standeffer, Brislane & Griffith; and Raymond Allen Tate, Jr. of Doyle & O'Rourke, all of Anderson, for respondents.

WALLER, Justice:

John Kevin Clark and Maggie Lee Anderson sued Annette Rochelle Cantrell for injuries and damages they incurred as a result of an automobile accident. A jury awarded actual and punitive damages to Clark and Anderson.[1] The Court of Appeals affirmed the verdicts and awards. *Clark v. Cantrell*, 332 S.C. 433, 504 S.E.2d 605 (Ct.App.1998). We granted Cantrell's petition for a writ of certiorari to review that decision. We affirm as modified.

## FACTS

Shortly after dark on November 1, 1993, Cantrell, driving a late-model Mustang GT with hazard lights flashing, sped down Highway 24 toward Anderson. The driver of a pickup truck that Cantrell passed on a two-lane stretch of road estimated Cantrell was traveling 75 to 80 mph, and she nearly collided

---

1. Clark owned the car Anderson was driving, but was not in the car when the accident occurred. Although both were plaintiffs, we will refer only to Anderson for simplicity's sake.

with the pickup truck while swerving back into the right lane. The pickup driver believed the Mustang, which continued to pass other vehicles in a similarly hazardous manner, had to be headed for the hospital.

Some distance down the highway, Anderson and a friend were headed to Georgia to buy tickets in the new lottery. Anderson, a nursing assistant at the local hospital, intended to gas up her 1980 Oldsmobile Cutlass and was waiting to turn left into a Hess service station.

Cantrell sped through an intersection a short distance from the Hess station, entering a busy stretch of four-lane highway flanked by restaurants and other retail businesses. The speeding Mustang scared a man whose wife, accompanied by their three boys, was taking him to his night-shift textile job. The man estimated the Mustang was traveling 75 to 100 mph.

Anderson waited for a car or two to go by, then began turning left across two lanes of traffic. The front of her car was at the entrance of the service station lot when Anderson glimpsed a small "turbo car" speeding toward her. The textile worker, still watching Cantrell's speeding car from the nearby intersection, saw it strike the right rear side of Anderson's Oldsmobile. The impact flung Anderson's friend, David James, from the car, killing him.

A state Highway Patrol trooper who reconstructed the accident scene pegged the Mustang's speed at 67 to 71 mph when Cantrell first applied her brakes. An accident reconstruction expert hired by Cantrell estimated her car was traveling 57 mph. The posted speed limit was 35 mph. The trooper and Cantrell's expert testified that, if she had been traveling 35 mph, the accident probably would not have occurred. Cantrell's expert also testified that he believed the primary cause of the accident was Anderson's decision to turn left in front of Cantrell's oncoming car.

When Cantrell emerged from her car, she was upset and screaming about the condition of her car, demanding that bystanders look at what had happened to it. She laughed as a trooper talked to her a short while later, although her laughter ended when she was informed someone had died in the accident. Cantrell told a trooper the next day that she was

speeding because her car was low on gas and she was in a hurry to reach a station.

Anderson and Clark alleged that Cantrell had caused their injuries and damages by speeding on the busy highway. Cantrell's primary defense was that Anderson caused the accident by turning left in front of her. The jury found Anderson sixteen percent at fault and Cantrell eighty-four percent at fault in the accident. The jury awarded Anderson $75,000 in actual damages and $25,000 in punitive damages; and Clark, the vehicle's owner, $3,000 in actual damages and $750 in punitive damages. The trial judge reduced the actual damages, but not the punitive damages, by the proportion of Anderson's fault.

## ISSUES

1. Did the Court of Appeals err in holding that punitive damages are not reduced by the proportion of the plaintiff's negligence under comparative negligence?

2. Did the Court of Appeals err in affirming the trial judge's refusal to admit Cantrell's computer-generated video animation of the accident as demonstrative evidence?

3. Did the Court of Appeals err in affirming the trial judge's refusal to give Cantrell's requested charge regarding excessive speed?

4. Did the Court of Appeals err in affirming the trial judge's refusal to instruct the jury on the sudden emergency doctrine?

## DISCUSSION

### 1. PUNITIVE DAMAGES

Cantrell contends the Court of Appeals erred in holding that punitive damages, unlike actual damages, are not reduced by the proportion of the plaintiff's negligence under comparative negligence. Cantrell argues punitive damages should be reduced proportionately because such damages serve, in part, a compensatory role. She relies on several cases decided before the adoption of comparative negligence in 1991. Fur-

ther, Cantrell asserts that reducing punitive damages is consistent with the adoption of comparative negligence because it focuses on both parties' degree of fault in causing an accident. We disagree.

■ We are free to decide this novel question of law with no particular deference to the lower court. *See* S.C. Const. art. V, §§ 5 and 9; S.C.Code Ann. §§ 14–3–320 and –330 (1976 & Supp.1999); S.C.Code Ann. § 14–8–200 (Supp.1999) (granting Supreme Court and Court of Appeals the jurisdiction to correct errors of law in both law and equity actions); *I'On v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000).

■ Comparative negligence is the law in South Carolina. *Nelson v. Concrete Supply Co.*, 303 S.C. 243, 399 S.E.2d 783 (1991). The jury must apportion fault between the plaintiff and defendant in a negligence action. The plaintiff may recover damages when his or her negligence is not greater than that of the defendant. The plaintiff's damages, however, are reduced in proportion to the amount of his or her negligence. *Id.* The parties agree that *Nelson* requires the reduction of plaintiff's actual damages. The novel issue presented in this case is whether the court must reduce *punitive* damages won by the plaintiff in proportion to the amount of his or her negligence.

■ The purpose of actual or compensatory damages is to compensate a party for injuries suffered or losses sustained. The goal is to restore the injured party, as nearly as possible through the payment of money, to the same position he or she was in before the wrongful injury occurred. *Barnwell v. Barber–Colman Co.*, 301 S.C. 534, 537, 393 S.E.2d 162, 163 (1989); *Laird v. Nationwide Ins. Co.*, 243 S.C. 388, 396, 134 S.E.2d 206, 210 (1964); *Carrigg v. Blue*, 283 S.C. 494, 499, 323 S.E.2d 787, 790 (Ct.App.1984); F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts* 535–36 (1997).

■ The purposes of punitive damages are to punish the wrongdoer and deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future. *Barnwell, supra.* Punitive damages also serve to vindicate a private right of the injured party by requiring the

wrongdoer to pay money to the injured party. *Harris v. Burnside*, 261 S.C. 190, 196, 199 S.E.2d 65, 68 (1973); Hubbard & Felix, *supra*, at 581–93. This Court has explained the important role that punitive damages play in the American system of justice generally, and in South Carolina in particular since at least 1784.

> Exemplary or punitive damages go to the plaintiff, not as a fine or penalty for a public wrong, but in vindication of a private right which has been willfully invaded; and indeed, it may be said that such damages in a measure compensate or satisfy for the willfulness with which the private right was invaded, but, in addition thereto, operating as a deterring punishment to the wrongdoer, and as a warning to others. . . . Punitive damages have now come, however, to be generally, though not universally, regarded, not only as punishment for wrong, but as vindication of private right. This is the basis upon which they are now placed in this state.

*Rogers v. Florence Printing Co.*, 233 S.C. 567, 573, 106 S.E.2d 258, 261 (1958) (citations omitted); *accord Hicks v. Herring*, 246 S.C. 429, 437–38, 144 S.E.2d 151, 155 (1965); *Mock v. Atlantic Coast Line R. Co.*, 227 S.C. 245, 267, 87 S.E.2d 830, 840 (1955); *Davenport v. Woodside Cotton Mills Co.*, 225 S.C. 52, 60, 80 S.E.2d 740, 743 (1954); *Watts v. Railroad Co.*, 60 S.C. 67, 73, 38 S.E. 240, 242 (1901).

Cases mentioning the compensatory aspect of punitive damages provide little support for Cantrell's position. All merely illustrate the obvious truth that punitive damages serve at least three important purposes: punishment of the defendant's reckless, willful, wanton, or malicious conduct; deterrence of similar future conduct by the defendant or others; and compensation for the reckless or willful invasion of the plaintiff's private rights. While there is a compensatory aspect to punitive damages, we find unpersuasive Cantrell's attempt to blur all distinctions between actual and punitive damages by unduly emphasizing that compensatory aspect.

█ We affirm the Court of Appeals' holding on this issue for four related reasons. First, allowing the defendant to shift a portion of the cost of a punitive award back to the plaintiff through comparative negligence would reduce the punishment

and deterrent effect of the award. The defendant's punishment would be lessened simply because the plaintiff was somewhat negligent. That is illogical and violates the underlying rationale of punitive damages.

As the Court of Appeals explained in this case, the overwhelming majority of other jurisdictions considering this issue have concluded that an award of punitive damages is not reduced under comparative negligence. Courts uniformly have held that allowing such a reduction would nullify the punishment and deterrence goals underlying punitive damages. *Clark*, 332 S.C. at 442 n. 5, 504 S.E.2d at 610 n. 5 (listing cases). In *Anderson v. Trent*, 685 S.W.2d 712 (Tex.Ct. App.1984), the court reasoned that

> if exemplary damages were *only* for compensating the plaintiff, then an argument could be made that they should be reduced by the percentage of the plaintiff's comparative negligence. However, the paramount purpose for awarding exemplary damages is *not* to compensate the plaintiff, but to punish and set an example for others. Consequently, it is incorrect to view the award of exemplary damages from the eyes of the recovering plaintiff; rather, the award should be viewed from the eyes of public policy.

*Id.* at 714 (emphasis in original) (citations omitted). In the only case which has allowed a reduction in punitive damages under comparative negligence, the court did so in part because it concluded Michigan law allows punitive damages only to compensate the plaintiff for injured feelings, not to punish and deter wrongdoers. *Parr v. Central Soya Co.*, 732 F.Supp. 738, 742–44 (E.D.Mich.1990).

Second, any reduction in the defendant's punishment inflicts a corresponding amount of punishment on the plaintiff. Shifting a portion of the cost of the punitive award back to the plaintiff essentially would punish him or her along with the defendant. In this case, Anderson would be punished by the loss of $4,000 (sixteen percent of $25,000 in punitive damages), money which the jury believed she rightly deserved. Yet Anderson in no way contributed to the willful or reckless nature of the defendant's conduct, and did nothing for which she should be punished.

Third, it would be inappropriate to reduce the punitive damages by comparing the plaintiff's *negligence* with the defendant's *reckless* or *willful* conduct. It is proper to reduce Anderson's actual damages in this case because the jury decided her negligent decision to turn left in front of Cantrell's speeding car contributed to causing the accident. But Anderson's negligent conduct was not willful or reckless. Conduct that is merely negligent should not be used to reduce damages the jury decided Cantrell should pay as a means of punishing her willful and reckless conduct, and deterring similar conduct by her and others in the future.

Fourth, when considering the negligence attributable to each party, the focus is on the actions of both plaintiff and defendant. What did each do, or not do, that contributed to the cause of an injury? With punitive damages, however, the focus is on only the defendant. The central inquiry is whether the defendant's conduct was so reckless, willful, wanton, or malicious that the defendant should be punished and deterred by requiring him or her to pay money to the plaintiff. *See Gamble v. Stevenson*, 305 S.C. 104, 110, 406 S.E.2d 350, 354 (1991) (listing factors focusing on defendant that court must consider in post-trial review of punitive award).

■ Cantrell also argues that the Court of Appeals erred because Anderson did not present clear and convincing evidence of Cantrell's reckless, willful, wanton, or malicious conduct. We conclude the Court of Appeals correctly reasoned that Cantrell's excessive speed, her disregard for the commercial nature of the highway, her lack of remorse, and her frivolous reason for speeding amply support the award of punitive damages.

■ In sum, we hold that punitive damages are not reduced by the proportion of the plaintiff's negligence under comparative negligence. We also affirm the award of punitive damages to Anderson and Clark.

## 2. COMPUTER–GENERATED VIDEO ANIMATION

Cantrell contends the Court of Appeals erred in affirming the trial judge's refusal to admit her computer-generated

video animation purporting to show how the accident occurred as demonstrative evidence. We disagree.

Cantrell wanted to introduce a video containing a computer-generated animation of the accident through her expert witness. Anderson objected, asserting the video did not accurately reflect the testimony of the witnesses or the experts who had reconstructed the accident. Specifically, the video animation did not accurately reflect the initial position of Anderson's car as described by Cantrell in her testimony. A portion of the animation also made it appear that Anderson's car pulled directly in front of Cantrell's car when Cantrell was almost upon it, which conflicted with the testimony of both parties' expert witnesses.

The trial judge refused to admit the video animation as demonstrative evidence because it was inconsistent with prior testimony, including that of Cantrell's expert witness, and it inaccurately reflected the evidence. Those deficiencies meant it would mislead and confuse the jury, the judge ruled.

We have not previously addressed the admissibility of computer-generated video animations as demonstrative evidence.[2] Cantrell does not object to the basic analysis used by the Court of Appeals, although she disagrees with the result reached in her case. We adopt the following analysis, modified slightly from that set out by the Court of Appeals.

---

2. We address this computer animation as demonstrative evidence, not as substantive or scientific evidence. *See Clark,* 332 S.C. at 448 n. 8, 504 S.E.2d at 613 n. 8 (finding that admission of computer animation as scientific evidence under precedent of United States Supreme Court needlessly complicates the matter by confusing the methodology of producing demonstrative evidence with its end result) (citing G. Ross Anderson, Jr., *Computer Animation: Admissibility and Uses,* South Carolina Trial Lawyer Bulletin 9, 10 (Fall 1995)).

Courts and commentators distinguish a computer animation and a computer simulation. An animation is used to illustrate a witness's testimony by recreating a scene or process, and properly is viewed as demonstrative evidence. A simulation is based on scientific or physical principles and data entered into a computer, which is programmed to analyze the data and draw a conclusion from it. Courts require proof of the validity of the scientific principles and data before admitting a simulation as evidence. *See* Kristin L. Fulcher, Comment, *The Jury As Witness: Forensic Computer Animation Transports Jurors to the Scene of a Crime or Automobile Accident,* 22 U. Dayton L.Rev. 55, 58–63 (1996) (discussing this distinction and citing cases).

Demonstrative evidence includes items such as a photograph, chart, diagram, or video animation that explains or summarizes other evidence and testimony. Such evidence has secondary relevance to the issues at hand; it is not directly relevant, but must rely on other material testimony for relevance. Demonstrative evidence is distinguishable from exhibits that comprise "real" or substantive evidence, such as the actual murder weapon or a written document containing allegedly defamatory statements.

These categories sometimes overlap. For example, a bank surveillance photograph of a robbery suspect may be classified as demonstrative evidence because it illustrates the crime scene; however, it also may be classified as substantive evidence of the identity of the perpetrator. *See* Mueller & Kirkpatrick, *Evidence,* §§ 9.31–9.36 (1999) (discussing various definitions and types of demonstrative evidence).

Demonstrative evidence often is admitted only for use in the courtroom to explain and illustrate a witness's testimony, but it also may be admissible as an exhibit for the jury to examine and consider during deliberations. *E.g., State v. Kelsey,* 331 S.C. 50, 502 S.E.2d 63, 76 (1998) (photographs and diagram of crime scene properly admitted in evidence); *Holmes v. Black River Elec. Co-op., Inc.,* 274 S.C. 252, 258, 262 S.E.2d 875, 878 (1980) (photographs of plaintiff's injured arm properly admitted in evidence); *State v. Barrs,* 257 S.C. 193, 199, 184 S.E.2d 708, 711 (1971) (upholding admission of coil of copper wire that was like the one allegedly stolen by defendants as proper demonstrative evidence); Mueller & Kirkpatrick, *supra,* § 9.31.

Attempts to use computer-generated video animations at trial, although not an everyday occurrence, are increasing. Computer animation is likely to become more prevalent, especially as the price of preparing such animations falls. G. Ross Anderson, Jr., *Computer Animation; Admissibility and Uses,* South Carolina Trial Lawyer Bulletin 9 (Fall 1995).

Computer animation allows attorneys to convert witnesses' verbal testimony into dynamic, visual demonstrations capable of mentally transporting jurors to the scene.... However, a computer animation can mislead a jury just as easily as it can educate them. An animation is only as good as the

underlying testimony, physical data, and engineering assumptions that drive its images. The computer maxim "garbage in, garbage out" applies to computer animations. Anderson, *supra,* at 9. As the Louisiana Supreme Court further explains,

> The extreme vividness and persuasiveness of motion pictures ... is a two-edged sword. If the film does not portray original facts in controversy, but rather represents a staged reproduction of one party's version of those facts, the danger that the jury may confuse art with reality is particularly great. Further, the vivid impressions on the trier of fact created by the viewing of the motion pictures will be particularly difficult to limit or, if the film is subsequently deemed to be inadmissible, to expunge by judicial instruction.

*State v. Trahan,* 576 So.2d 1, 8 (1990) (quoting McCormick on Evidence, § 214 (2d ed.1972)). Likewise, our Court of Appeals correctly highlighted several concerns about computer animations: the potential to mislead by an inaccurate portrayal of the facts, the potential to create lasting impressions that unduly override other testimony or evidence, and the need for heightened guarantees of trustworthiness due to the possibility of editorial distortion by the party preparing the animation. *Clark,* 332 S.C. at 445–46, 504 S.E.2d at 612.

■ Despite the dangers, computer animations can serve worthwhile purposes if screened carefully and admitted cautiously. We hold that a computer-generated video animation is admissible as demonstrative evidence when the proponent shows that the animation is (1) authentic under Rule 901, SCRE; (2) relevant under Rules 401 and 402, SCRE; (3) a fair and accurate representation of the evidence to which it relates, and (4) its probative value substantially outweighs the danger of unfair prejudice, confusing the issues, or misleading the jury under Rule 403, SCRE. *See* Anderson, *supra,* at 9; Mueller & Kirkpatrick, *supra,* § 9.34; Gregory P. Joseph, *A Simplified Approach to Computer–Generated Evidence and Animations,* 156 F.R.D. 327 (1994) (all suggesting ways to analyze admission of computer animations).

■ To ensure that the opposing party has sufficient time to analyze the animation, the trial court also should

consider whether the proponent disclosed the animation and underlying data within a reasonable period of time before trial. *Cf. Ramos v. Hawley,* 316 S.C. 534, 536, 451 S.E.2d 27, 28 (Ct.App.1994) ("[p]roper trial procedure for the introduction of evidence requires that opposing counsel be given a reasonable opportunity to inspect the proposed evidence before it is accepted by the court. This opportunity allows counsel to determine whether an objection is proper."); *see also Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876 (Mo.1993) (upholding trial judge's refusal to admit computer simulation where party did not give notice of it to opponent until last business day before trial, hindering opponent's ability to challenge its admission or cross-examine experts who prepared it); Anderson, *supra,* at 11 (suggesting animation and underlying data should be disclosed at least two weeks before trial). Untimely disclosure should not, standing alone, necessarily result in exclusion of the animation. But late disclosure may prevent the opposing party from adequately attempting to explain why the animation is not a fair and accurate representation which, in turn, may prompt the court to conclude its probative value does not substantially outweigh the danger of unfair prejudice.

■ We also encourage the trial court to give a cautionary instruction that the animation represents only a re-creation of the proponent's version of the event; it should in no way be viewed as the absolute truth; and, like all evidence, it may be accepted or rejected in whole or in part. The court may wish to call attention to any assumptions upon which the animation is based, as well as any other particular facts that warrant a cautionary instruction. *See* Mueller & Kirkpatrick, *supra,* § 9.34; Fulcher, *supra,* at 75–76.

■ Finally, the trial court, as with other evidence and testimony, has broad discretion in whether to admit a computer animation, and its decision will be overturned only for an abuse of discretion. *See Holmes v. Black River Elec. Co-op., Inc.,* 274 S.C. at 258, 262 S.E.2d at 878; *Brown v. Orndorff,* 309 S.C. 320, 324–25, 422 S.E.2d 151, 153–54 (Ct.App.1992).

Under the above analysis, we conclude the Court of Appeals properly affirmed the trial court's refusal to admit the video animation in this case.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a), SCRE. Thus, a party may authenticate a video animation by offering testimony from a witness familiar with the preparation of the animation and the data on which it is based. In this case, the animation was authenticated by the testimony of the expert who prepared the underlying data and the computer technician who used that data to create it.

Next, an animation is relevant when it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy. Rules 401–402, SCRE; *State v. Alexander*, 303 S.C. 377, 401 S.E.2d 146 (1991). An animation may be relevant when it relates to other admissible, material evidence and it will aid the trier of fact in understanding the related evidence. Anderson, *supra*, at 10. In this case, the animation was relevant because it was related to the testimony of several witnesses about the accident. It would have aided the jury in understanding that testimony, provided it did not have to be excluded on other grounds.

Next, the animation must be a fair and accurate representation of the evidence to which it relates. It need not be exact in every detail, but the important elements must be identical or very similar to the scene as described in other testimony and evidence presented by the animation's proponent in order to constitute a fair and accurate representation. In an animation reconstructing a vehicle accident, for instance, the animation must be technically correct on details such as distance, terrain, relative speed, path of travel, and surroundings. The fact the animation is inconsistent with testimony or evidence presented by the opposing party should not necessarily lead to its exclusion, provided it fairly and accurately portrays the proponent's version of events. *E.g., Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 424–25 (4th Cir.1996) (explaining that a computer-animated videotape is essentially like a real-life re-creation and thus it must be sufficiently close to actual facts); *Hutchinson v. American Family Mut. Ins. Co.*, 514 N.W.2d 882, 890 (Iowa 1994) (upholding trial court's refusal to admit animation generally illustrating how a closed-

head injury occurs because it was not based upon particular facts of plaintiff's case and witness was not familiar with specific speeds and forces in the case); *Sommervold v. Grevlos*, 518 N.W.2d 733, 738 (S.D.1994) (upholding trial court's refusal to admit animation of colliding bicycles because speed of bicycles, street lights, and location of accident did not match. witnesses' testimony); *Trahan*, 576 So.2d at 8 (upholding trial court's refusal to admit videotape reconstruction of crime scene it did not depict parties in an identical or similar manner to the incident as testified to by defendant); Anderson, *supra*, at 10–12.

In this case, the trial judge properly excluded the animation because it did not accurately reflect the testimony of the proponent and her expert witness. The animation did not accurately reflect the initial position of Anderson's car as Cantrell described it in her testimony. A portion of the animation also made it appear that Anderson's car pulled directly in front of Cantrell's car when Cantrell was almost upon it. Cantrell's expert witness, however, testified Cantrell could have first seen Anderson's car some distance back from the point where Cantrell's car initially was positioned in the animation.

Finally, the probative value of the animation must substantially outweigh the danger of unfair prejudice, confusing the issues, or misleading the jury under Rule 403, SCRE. *See* Fulcher, *supra*, at 70 (explaining this factor often is a "formidable obstacle" due to the relatively recent advent of computer animation, although such fears are diminishing as judges and the public become more familiar with computer technology). In this case, the probative value of the animation did not substantially outweigh the danger of unfair prejudice and misleading the jury due to the inaccuracies it contained.

Accordingly, we hold the trial judge did not abuse his discretion in refusing to admit the computer animation as demonstrative evidence, and the Court of Appeals correctly affirmed that ruling.

### 3. EXCESSIVE SPEED CHARGE

Cantrell argues the Court of Appeals erred in affirming the trial judge's refusal to give her requested charge regarding excessive speed. We disagree.

The trial judge refused to give the following charge requested by Cantrell:

It is without legal significance that speed was a contributing factor in placing the vehicle at a particular location on the favored road when the emergency arose, since [the] driver of such vehicle had the legal right to occupy that portion of the road.

The Court of Appeals affirmed, concluding the trial court correctly refused to find as a matter of law that the accident was inevitable. *Clark*, 332 S.C. at 444, 504 S.E.2d at 611.

Cantrell asserts the Court of Appeals erred because the instruction correctly stated a principle of law that applied in her case. Cantrell relies primarily on *Horton v. Greyhound*, 241 S.C. 430, 128 S.E.2d 776 (1962).

In *Horton*, a Greyhound bus that was exceeding the posted speed limit collided with an oncoming pickup truck when the truck suddenly swerved into the bus's lane in order to pass another vehicle that had stopped to make a lefthand turn. The collision killed the pickup's driver and passenger. The passenger's estate filed an action against the bus company and its driver.

This Court affirmed a directed verdict for the defendants. The Court reasoned the collision was inevitable because, even if the bus could have stopped short of the collision point, it likely would have occurred anyway. Although there was evidence of negligence (speeding) by the defendant, it was one of the rare cases in which that evidence was insufficient to raise a jury question on whether the defendant's speed caused the accident. *Horton*, 241 S.C. at 441, 128 S.E.2d at 782. The Court has reached a similar conclusion in other cases.[3]

---

3. *Blanding v. Hammell*, 267 S.C. 352, 356–57, 228 S.E.2d 271, 272–73 (1976) (citing *Horton* in affirming directed verdict where all testimony showed plaintiff pulled directly in front defendant; defendant's slight speeding could not, as a matter of law, have caused the accident); *Odom v. Steigerwald*, 260 S.C. 422, 426–27, 196 S.E.2d 635, 637 (1973) (citing *Horton* in reversing denial of plaintiff's directed verdict motion on liability because, as a matter of law, any speeding by plaintiff could not have caused accident where evidence showed defendant's vehicle pulled directly into plaintiff's path); *Roumillat v. Keller*, 252 S.C. 512, 516, 167 S.E.2d 425, 428 (1969) (citing *Horton* in reasoning that while defendant's excessive speed may not have caused first collision, in

We recently made it clear that a judgment as a matter of law pursuant to *Horton* and its progeny is proper only in the exceedingly rare case when the evidence, viewed in the light most favorable to the non-moving party, shows that the speed of a vehicle could not have contributed to the cause of the accident. "Of course, in most automobile accident cases, speed creates imponderable issues of time and distance which must be resolved by the jury." *Tubbs by Duren v. Bowie,* 308 S.C. 155, 158, 417 S.E.2d 550, 552 (1992) (quoting *Blanding v. Hammell, supra*).

In explaining its decision, the *Horton* Court stated the fact that "speed was a contributing factor in placing the bus at a particular location on the highway when the emergency arose is without legal significance, because the [bus] had the legal right to occupy that portion of the highway." *Horton,* 241 S.C. at 439, 128 S.E.2d at 781. It is from this language that Cantrell drew her request for a jury charge.

All of the above cases involve the propriety of a judgment as a matter of law based on *Horton.* Cantrell's argument, however, focuses upon the propriety of a jury instruction drawn from *Horton.*

 An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court abused its discretion. *Dalon v. Golden Lanes, Inc.,* 320 S.C. 534, 541, 466 S.E.2d 368, 372 (Ct.App.1996); *Smith v. Ridgeway Chemicals, Inc.,* 302 S.C. 303, 307, 395 S.E.2d 742, 744 (Ct.App.1990). An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support. *Fontaine v. Peitz,* 291 S.C. 536, 354 S.E.2d 565 (1987).

which oncoming vehicle crossed median and struck his vehicle, his speed still could be deemed proximate cause of second collision when his own vehicle crossed median and struck an oncoming vehicle); *Kennedy v. Carter,* 249 S.C. 168, 178, 153 S.E.2d 312, 317 (1967) (citing *Horton* in reversing denial of directed verdict for defendant who swerved off road to avoid oncoming drunken driver; defendant's speeding could not, as a matter of law, have caused the accident); *Guyton v. Guyton,* 244 S.C. 357, 361–62, 137 S.E.2d 273, 275 (1964) (citing *Horton* in affirming directed verdict for defendant whose vehicle collided with a dark-colored mule that darted onto road at night; defendant's speeding could not, as a matter of law, have caused the accident).

 When instructing the jury, the trial court is required to charge only principles of law that apply to the issues raised in the pleadings and developed by the evidence in support of those issues. *Tucker v. Reynolds,* 268 S.C. 330, 335, 233 S.E.2d 402, 404 (1977). Furthermore, the trial court is required to charge only the current and correct law of South Carolina. *McCourt by McCourt v. Abernathy,* 318 S.C. 301, 306, 457 S.E.2d 603, 606 (1995).

 It is error for the trial court to refuse to give a requested instruction which states a sound principle of law when that principle applies to the case at hand, and the principle is not otherwise included in the charge. *Sanders v. Western Auto Supply Co.,* 256 S.C. 490, 497, 183 S.E.2d 321, 325 (1971). However, the trial court is not required to instruct the jury on a principle of law that is irrelevant to the case as proved. *Greenville Housing Authority of City of Greenville by Carlton v. Massey,* 281 S.C. 618, 622, 316 S.E.2d 722, 724 (Ct.App.1984) (citing *Clarke v. Swearingen,* 6 S.C. 291 (1875)). Moreover, even if the trial court erred in failing to give a requested instruction, the requesting party also must show that the error was prejudicial to warrant reversal on appeal. *Miller v. City of West Columbia,* 322 S.C. 224, 471 S.E.2d 683 (1996); *McCourt,* 318 S.C. at 306, 457 S.E.2d at 606.

 We conclude that Cantrell's proposed instruction was improper and irrelevant in this case because the speed of her vehicle plainly was of legal significance in deciding the cause of the accident. The trial judge properly denied Cantrell's requested instruction, as well as her directed verdict motion. Viewing the evidence in the light most favorable to Anderson, it was for the jury to decide whether the accident was caused by Cantrell's speed, Anderson's decision to turn left in front of Cantrell's oncoming vehicle, or the acts of both drivers. The *Horton* line of cases is inapplicable.

We never have indicated that a *Horton* charge such as the one requested by Cantrell is necessary or appropriate. In fact, we doubt Cantrell's proposed instruction could ever be presented as a sound principle of law to a jury in any collision case. Cantrell essentially asked the judge to tell the jury that, as a matter of law, it did not matter whether she was

speeding because her speed could not have caused the accident. A judge who instructed the jury in that fashion would be deciding the very issue presented to the jury—whether a litigant's negligent speeding was the legal and proximate cause of an accident. In addition, a judge under our comparative negligence system would be telling the jury to ignore a party's speeding when resolving the proportion of fault attributable to each party. Such a charge would be improper for both reasons.

In the exceedingly rare case when "it is without legal significance that speed was a contributing factor" in a collision, and the record contains no evidence of other negligent or wrongful acts by the speeding driver, the judge may grant a litigant's directed verdict motion under *Horton* and its progeny. There would be nothing for the jury to resolve because, as a matter of law, any excessive speeding could not have caused the accident.

Accordingly, we hold the Court of Appeals properly affirmed the trial judge's rejection of Cantrell's proposed instruction.

## 4. SUDDEN EMERGENCY CHARGE

Cantrell contends the Court of Appeals erred in affirming the trial judge's refusal to instruct the jury on the doctrine of sudden emergency. She asserts the charge was required in order for the jury to understand the emergency in which Cantrell found herself when Anderson's vehicle turned left in front of hers. We disagree.

"When the driver of an automobile is confronted with a sudden emergency *brought about by the negligence of another and not by his own negligence,* and [is] compelled to act instantly to avoid a collision or an injury, [that driver] is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in a like position might make, even though he did not make the wisest choice." *Still v. Blake,* 255 S.C. 95, 105, 177 S.E.2d 469, 474 (1970) (emphasis added) (concluding sudden emergency doctrine properly was charged to jury where plaintiff veered left to avoid colliding with defendant's vehicle, which had signaled to turn right but

unexpectedly turned left); *accord Spahn v. Town of Port Royal*, 326 S.C. 632, 486 S.E.2d 507 (Ct.App.1997) (concluding sudden emergency doctrine properly was charged to jury where police officer's vehicle injured plaintiff as plaintiff was trying to retrieve his boat from middle of road), *aff'd as modified by Spahn v. Town of Port Royal*, 330 S.C. 168, 499 S.E.2d 205 (1998); *Singletary v. South Carolina Dep't of Educ.*, 316 S.C. 153, 447 S.E.2d 231 (Ct.App.1994) (concluding it was a jury question on whether defendant school bus driver acted prudently under sudden emergency doctrine when driver failed to pull off foggy highway after bus stalled, and was struck from rear by plaintiff's vehicle).

▮ The sudden emergency doctrine is intended to protect a driver who, while acting with due care, suddenly finds herself in an emergency situation due to the negligent or wrongful acts of another. The doctrine does not apply when a party's own negligence creates the very emergency in which she finds herself.

▮ In this case, Cantrell's allegedly excessive speed created the emergency. Accordingly, the Court of Appeals correctly affirmed the trial judge's refusal to instruct the jury on the sudden emergency doctrine.

## CONCLUSION

We hold that punitive damages, unlike actual damages, are not reduced in comparative negligence. We hold that computer-generated video animations are admissible in appropriate circumstances. We hold that the trial judge correctly rejected the proposed jury instructions on excessive speed and the sudden emergency doctrine. We affirm the Court of Appeals' rulings on all these issues, although we modify the analysis used to determine the admissibility of video animations. We find Cantrell's remaining arguments on other evidentiary matters unpersuasive and affirm the Court of Appeals' rulings on those issues.

AFFIRMED AS MODIFIED.

FINNEY, C.J., TOAL, MOORE and BURNETT, JJ., concur.