**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

Jermasha Nelson, Appellant.

Appellate Case No. 2019-000641

———

Appeal From Beaufort County
Carmen T. Mullen, Circuit Court Judge

———

Unpublished Opinion No. 2022-UP-350
Heard March 9, 2022 – Filed September 7, 2022

———

**AFFIRMED**

———

Appellate Defender Adam Sinclair Ruffin and Appellate Defender Kathrine Haggard Hudgins, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General William M. Blitch, Jr., and Assistant Attorney General Jonathan Scott Matthews, all of Columbia; and Isaac McDuffie Stone, III, of Bluffton, all for Respondent.

———

**PER CURIAM:** A Beaufort County jury convicted Jermasha Nelson of felony driving under the influence (DUI) resulting in the death of Gordon Ward (Victim). The trial court sentenced Nelson to fourteen years' imprisonment. Nelson appeals, arguing the trial court erred in allowing the State to use a computer animation of the accident and in allowing the opinion testimony of a physician's assistant. We affirm.

## FACTS/PROCEDURAL HISTORY

Corporal Michael Bucciantini testified he was called to the scene of a fatal collision involving a car and a moped in Beaufort County at 6:00 A.M. on September 5, 2016. Corporal Bucciantini walked through the scene and saw the deceased victim—the moped driver—lying in the median. Victim's wallet and other items were scattered around the scene. The rear wheel of Victim's moped was "heavily deformed" due to the car hitting it from behind. The car's front windshield and sun-roof were blown out, and the roof was severely damaged from Victim going over the top of the car. Corporal Bucciantini stated the scene was much longer than a standard collision scene. This led him to believe there was "some speed involved."

After investigators identified Nelson as the driver of the car, Corporal Bucciantini interviewed her at the hospital. He testified that Nelson told him she "had been traveling in the left-hand lane, and a moped . . . pulled out in front of her, and she struck the rider." Corporal Bucciantini testified that as Nelson spoke to him, he smelled "a very, very strong odor of alcoholic beverage coming from her . . . actually overpowering . . . the aseptic smell of the hospital." Corporal Bucciantini further stated Nelson's speech was "very slurred, [and] her eyes were bloodshot and glassy. . . ." He further noted, "She was somewhat uncooperative. Based on those facts, I had reason to believe that she may have been impaired." Nelson told Corporal Bucciantini she had consumed two beers. After Nelson refused a blood draw, Corporal Bucciantini left the hospital, returned with a warrant, and obtained a blood sample from Nelson. However, the warrant was for "medical and lab records," leading the trial court to suppress the blood draw because it found the warrant was defective.

During cross-examination, Nelson's counsel asked Corporal Bucciantini whether he administered a field sobriety test to Nelson at the hospital or at the police station. Corporal Bucciantini explained he could not administer a test to Nelson because she was in bed at the hospital. He also stated that by the time Nelson was at the police station, she had "already refused . . . other testing." Nelson's counsel

showed Corporal Bucciantini Nelson's medicine administration records from the hospital, which indicated that Nelson had been given Morphine. Corporal Bucciantini affirmed he was not aware of the records.

A paramedic, Doug Tisdale, testified that he was the first responder to the scene. After finding the deceased victim, Tisdale found Nelson looking at her busted lip in the mirror of her car. Tisdale testified the smell of alcohol was "pretty obvious" as he was trying to determine the extent of Nelson's injuries. Nelson told Tisdale she had consumed two beers.

Misty Shipley testified the accident happened on the road in front of her house. She heard the crash, called 911, and went outside. Shipley found Nelson next to the car and approached her to see if she was injured. Shipley testified she smelled a very strong odor of alcohol around Nelson and walked away from her so Nelson would not hear her speak to the 911 operator. During the 911 call that was played for the jury, Shipley told the 911 operator "she's drunk . . . I can smell it."

A road deputy, Dan Duhamel, testified he was at the hospital for an unrelated matter and entered Nelson's room to assist another deputy because he heard a commotion. During the interaction, Deputy Duhamel noted that Nelson's eyes were glassy, glazed, and bloodshot. He stated she was "heavily intoxicated."

Corporal Todd Proctor of the South Carolina Highway Patrol was qualified as an expert witness in accident reconstruction and other related areas. Corporal Proctor opined that 1.3 seconds before impact with the moped, Nelson's speed was 110 mph and the brake was not depressed. He further testified that .8 seconds before impact Nelson's speed was 105.6 mph and the brake was applied.

Sergeant James Booker of the South Carolina Highway Patrol was qualified as an expert in accident reconstruction. Sergeant Booker investigated the scene for skid and gouge marks, areas of impact, and other clues to reconstruct the accident. He also examined the damage to the moped and car to determine areas of impact. The State introduced a computerized animated recreation of the accident prepared by Sergeant Booker. Nelson objected, arguing the animation did not accurately reflect the lighting conditions present during the accident and did not correctly depict the accident. The trial court admitted the animation for demonstrative purposes and noted that Nelson could cross-examine Sergeant Booker and other witnesses about any inaccuracies. During cross-examination, Sergeant Booker discussed how the data from the car's crash data retrieval system (CDR) was incorporated into the

animation. He also explained that he could not use nighttime lighting conditions in the animation because the vehicle and moped would not be visible.

Kate D'Orazio treated Nelson in the hospital, and the trial court qualified her as an expert in emergency medicine as a physician's assistant. During D'Orazio's proffered testimony, the State noted D'Orazio had reviewed Nelson's medical records, which showed her blood alcohol level as .215. The State announced its intention to ask D'Orazio's opinion, "based on her review of the record, based on her personal exam of her," whether Nelson was under the influence of alcohol when she was in the hospital. The trial court asked D'Orazio whether she had any "independent personal knowledge [of Nelson's intoxication], like smelling alcohol about her." D'Orazio said "no." The trial court asked D'Orazio if she would have gotten close enough to Nelson to know whether she was intoxicated and D'Orazio replied, "Sure. I just – I don't recall." At the end of the proffer, D'Orazio stated that "if I were to review her packet, her case that I have here, in reviewing her history and labs that were done here, I would say that she, yes, was intoxicated." Nelson objected to the proffered testimony by stating there were "numerous problems with that, one of which is we are making observations, at least according to her notes[,] at 9 o'clock. This accident happened about 5:45 in the morning." D'Orazio's notes from 9:00 A.M. show that Nelson told D'Orazio she had an elevated blood alcohol level. The trial court, while reiterating that the actual blood alcohol number was inadmissible, ruled D'Orazio could give an opinion as to whether Nelson was intoxicated.

In her testimony in front of the jury, D'Orazio stated Nelson received 4 milligrams of Morphine when she arrived at the hospital. D'Orazio testified that "[b]ased on the charting here, and my history and labs, I would say yes, she was under the influence of alcohol." The trial court then asked D'Orazio if her opinion was within a reasonable degree of medical certainty, and D'Orazio replied, "Based on her chart that I have here and the labs that were drawn, yes."

Nelson's medical records, including D'Orazio's notes, were not entered into evidence or published to the jury. The jury convicted Nelson of felony DUI, and the trial court sentenced her to fourteen years' imprisonment. This appeal followed.

**ISSUES ON APPEAL**

I.      Did the trial court err in allowing the State to use a computer animated recreation of the accident?

II.    Did the trial court err in allowing D'Orazio's opinion testimony regarding Nelson's intoxication?

**STANDARD OF REVIEW**

"In criminal cases, the appellate court sits to review errors of law only." *State v. Dantonio*, 376 S.C. 594, 602, 658 S.E.2d 337, 341 (Ct. App. 2008). "An appellate court is bound by the trial court's factual findings unless they are clearly erroneous." *Id.* at 602, 658 S.E.2d at 341–42. "A trial court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion or the commission of legal error that results in prejudice to the defendant." *State v. Cuevas*, 365 S.C. 198, 201, 616 S.E.2d 718, 720 (Ct. App. 2005). "The appellate court should examine the record to determine whether there is any evidence to support the trial court's ruling. If there is any evidence in the record, the appellate court should affirm." *Id.*

"[T]he trial court, as with other evidence and testimony, has broad discretion in whether to admit a computer animation, and its decision will be overturned only for an abuse of discretion." *Clark v. Cantrell*, 339 S.C. 369, 385, 529 S.E.2d 528, 537 (2000).

"Generally, the admission of expert testimony is a matter within the sound discretion of the trial court." *State v. Cope*, 405 S.C. 317, 343, 748 S.E.2d 194, 208 (2013) (quoting *State v. Whaley*, 305 S.C. 138, 143, 406 S.E.2d 369, 372 (1991)).

**LAW/ANALYSIS**

**I. Computer Animation**

Nelson argues the trial court erred in allowing the State to use the computer animation because it did not fairly and accurately represent the accident. Specifically, she asserts the animation did not properly depict the lighting conditions during the accident or depict her version of events and was misleading to the jury. We disagree.

In *Clark*, our supreme court stated,

a computer-generated video animation is admissible as demonstrative evidence when the proponent shows that the animation is (1) authentic under Rule 901, SCRE; (2) relevant under Rules 401 and 402, SCRE; (3) a fair and accurate representation of the evidence to which it relates, and (4) its probative value substantially outweighs the danger of unfair prejudice, confusing the issues, or misleading the jury under Rule 403, SCRE.

339 S.C. at 384, 529 S.E.2d at 536.

Further, the *Clark* court noted that an animation

need not be exact in every detail, but the important elements must be identical or very similar to the scene as described in other testimony and evidence presented by the animation's proponent in order to constitute a fair and accurate representation. In an animation reconstructing a vehicle accident, for instance, the animation must be technically correct on details such as distance, terrain, relative speed, path of travel, and surroundings. The fact the animation is inconsistent with testimony or evidence presented by the opposing party should not necessarily lead to its exclusion, provided it fairly and accurately portrays the proponent's version of events.

339 S.C. at 386, 529 S.E.2d at 537.

Initially, we note the first two prongs of *Clark* are satisfied here. The animation was authenticated by Sergeant Booker, who explained in detail his method of creating the animation through accident reconstruction. The animation was relevant because it aided the jury in understanding the events of the accident.

As to whether it was a fair and accurate representation, the animation showed the important elements of the accident in a very similar way to the scene as described by other testimony and evidence. Sergeant Booker explained it was not possible to show the accident in the darkness of night. He also explained the underlying analysis relating to the positions of Nelson's car and Victim's moped in the animation. He testified about Nelson's speed immediately prior to impact and after impact. There was testimony about what happened to Victim during the accident

and the position of Victim's body after impact. The animation fairly and accurately portrayed the State's version of events.

Further, because the animation was not inaccurate, the trial court did not abuse its discretion in ruling the probative value of the animation substantially outweighed the danger of its prejudicial, confusing, or misleading effect on the jury. *Id.* at 387, 529 S.E.2d at 538 ("[T]he probative value of the animation did not substantially outweigh the danger of unfair prejudice and misleading the jury *due to the inaccuracies it contained.*" (emphasis added)). Therefore, we affirm on this issue.

## II. Opinion Testimony

Nelson argues the trial court erred in allowing D'Orazio to give an opinion about Nelson's intoxication. Nelson contends D'Orazio did not have independent personal knowledge of whether Nelson was intoxicated because D'Orazio's opinion was based solely on a review of medical records, which included the results of the inadmissible blood draw. We disagree.

Rule 703, SCRE, provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Here, the record reflects that although D'Orazio initially stated she could not remember whether Nelson was intoxicated, she subsequently reviewed Nelson's medical records. D'Orazio testified she began her shift at 7:00 A.M. on the morning of the accident. The notes from 9:00 A.M. show that Nelson told D'Orazio she had an elevated blood alcohol level. The notes in the medical records show that Nelson was uncooperative and aggressive towards hospital staff and law enforcement. The notes also reflect that Nelson told hospital staff that she "drank two beers". As permitted by Rule 703, D'Orazio based her opinion on facts or data that she was made aware of and personally observed. These facts or data did not need to be admissible in evidence. Therefore, the trial court did not err in allowing D'Orazio to give an opinion about Nelson's intoxication based on her review of Nelson's medical records. *See State v. Slocumb*, 336 S.C. 619, 626–27, 521 S.E.2d

507, 511 (Ct. App. 1999) ("The admission of evidence is within the trial [court]'s discretion and will not be disturbed on appeal absent abuse of that discretion.").

**CONCLUSION**

Based on the foregoing, Nelson's conviction is.

**AFFIRMED.**

**WILLIAMS, C.J., and KONDUROS and VINSON, JJ., concur.**