741 S.E.2d 708

**The STATE, Respondent,**

v.

**Stephen Christopher STANKO, Appellant.**

Appellate Case No. 2010–154746.

No. 27224.

Supreme Court of South Carolina.

Heard Oct. 4, 2012.
Decided Feb. 27, 2013.
Rehearing Denied April 3, 2013.

See also 376 S.C. 571, 658 S.E.2d 94.

Chief Appellate Defender Robert M. Dudek and Appellate Defender Robert M. Pachak, both of Columbia, SC, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General J. Anthony Mabry, all of Columbia, SC, and Solicitor John Gregory Hembree of Conway, SC, for Respondent.

Chief Justice TOAL.

Stephen Christopher Stanko (Appellant), appeals his conviction and death sentence for murder and armed robbery. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

On April 8, 2005, at approximately 3:30 a.m., Appellant called his friend, seventy-four year old Henry Turner (the Victim), and falsely informed him that Appellant's father had died. Appellant arrived at the Victim's residence around 4:00 a.m. Later that morning, the Victim drove to a nearby McDonald's restaurant for breakfast. After returning with breakfast, sometime later that morning, the Victim was shaving in front of his bathroom mirror. Appellant approached the Victim from behind with a gun and a pillow as a silencer, and shot him in the back. Appellant then struck the Victim in the head, and fatally shot him in the chest.

Appellant stole the Victim's gray Mazda truck and fled the scene. On the evening of April 8, Appellant visited Columbia's Vista district. Appellant held himself out as a resident of New York City, visiting South Carolina to close a "big deal." Appellant proceeded to spend large amounts of cash and buy drinks for several people he met that night.

On April 9, Appellant travelled to Augusta, Georgia and visited Surrey Tavern. There, Appellant met a woman, and

convinced her that he was a businessman in town for The Master's Golf Tournament. Appellant and the woman spent the next several days together, and Appellant stayed at her apartment. The two attended church services together on Sunday, April 10, and she introduced Appellant to her co-workers on Monday, April 11. Appellant left the woman's apartment at approximately 1:00 a.m. on Tuesday, April 12. Later that day, the woman recognized Appellant's picture in the newspaper with a headline alerting her to his alleged involvement in the Victim's murder. She notified police and assisted in Appellant's arrest. Appellant possessed the Victim's vehicle at the time of his arrest. Police searched the vehicle and recovered a bag containing a .357 Magnum caliber double-action revolver, .38 caliber bullets, and a checkbook belonging to the Victim. Testing later revealed that the .357 Magnum fired the bullets recovered from the Victim's body.

On August 25, 2005, the Horry County Grand Jury indicted Appellant for the Victim's murder and armed robbery. The case proceeded to trial, and Appellant relied on an insanity defense. Specifically, Appellant averred that he suffered from central nervous system dysfunction, and at the time of the Victim's murder he did not understand "legal right from wrong." On November 16, 2009, a jury found Appellant guilty of murder and armed robbery. Three days later, following the conclusion of the trial's penalty phase, the jury found beyond a reasonable doubt the existence of the requisite statutory aggravating circumstance and recommended the trial court sentence Appellant to death. Consequently, the trial court sentenced Appellant to the maximum twenty years' imprisonment for armed robbery and to death by lethal injection for the Victim's murder.

## ISSUES PRESENTED

I. Whether the trial court erred by instructing the jury that malice could be inferred from the use of a deadly weapon where Appellant presented an insanity defense.

II. Whether the trial court erred in accepting Appellant's waiver of his trial counsel's conflict of interest where that counsel was subject to a pending accusation of ineffective assistance of counsel for his representation of Appellant in a prior capital murder case.

III. Whether the trial court erred in refusing to disqualify a juror who acknowledged she knew that Appellant received the death penalty for a prior capital murder, and stated unequivocally that she would vote to impose death in every instance where the State proved an aggravating circumstance beyond a reasonable doubt.

IV. Whether the trial court abused its discretion by refusing to grant a change of venue.

V. Whether the trial court erred by allowing all jurors over sixty-five to opt out of jury service.

VI. Whether the trial court erred by ruling that Appellant's execution did not violate the Eighth Amendment to the United States Constitution.

## Law/Analysis

### I. Jury Instruction on Inferred Malice

Appellant argues that the trial court erred by instructing the jury that it could infer malice from the use of a deadly weapon where Appellant presented an insanity defense. We agree.

A jury charge instructing that malice may be inferred from the use of a deadly weapon is no longer good law in South Carolina where evidence is presented that would reduce, mitigate, excuse, or justify the homicide. *State v. Belcher*, 385 S.C. 597, 600, 685 S.E.2d 802, 803–04 (2009). In *Belcher*, the jury convicted the defendant of murder and possession of a firearm during the commission of a violent crime. *Id.* at 600, 685 S.E.2d at 803. During a gathering of family and friends, the victim and another man began arguing. The defendant intervened, and later shot and killed the victim. *Id.* at 601, 685 S.E.2d at 805.

Testimony at trial demonstrated conflicting versions of the event. *Id.* The State's evidence tended to show that after the defendant confronted the victim, the defendant retrieved a gun and without justification, fatally shot the victim. *Id.* The defendant presented evidence that the victim confronted him without provocation, and with a gun, following the apparent resolution of the argument. *Id.* The defendant claimed he

subsequently retrieved a gun and fired on the victim as he approached. *Id.* In accordance with long-standing practice, the trial court instructed the jury that "malice may be inferred by the use of a deadly weapon," and the jury convicted the defendant of murder. *Id.*

This Court reversed, and rejected the traditional jury instruction as inconsistent with our policy-making role in the common law:

> The use of the term "intentional" is instructive. Say for example, a homicide occurs by the use of a deadly weapon under circumstances warranting a self-defense instruction. The killing would be intentional, yet under our currently sanctioned charge, the jury would be permitted to find malice merely because "if one intentionally kills another with a deadly weapon, the implication of malice may arise."

*Id.* at 610, 685 S.E.2d at 809 (citing *State v. Elmore*, 279 S.C. 417, 421, 308 S.E.2d 781, 784 (1983), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 69 n. 5, 406 S.E.2d 315, 328 n. 5 (1991)). The Court also held that the error in *Belcher* could not be considered harmless:

> Evidence of self-defense was presented, thereby highlighting the prejudice resulting from the charge. It is entirely conceivable that the only evidence of malice was [the defendant]'s use of a handgun. We need go no further than saying we cannot conclude the error was harmless beyond a reasonable doubt.

*Id.* at 611–12, 685 S.E.2d at 809–10 ("In many, if not most, murder cases the [inferred malice from the use of a deadly weapon] charge will be harmless, even if couched in terms of a presumption. . . . Obviously[,] when a defendant walks into a store [and] shoots and robs the clerk, a charge that the jury may infer malice is not prejudicial to the defendant." (alterations in original)).

In the instant case, Appellant presented evidence he had a brain abnormality. A psychiatric expert testified that he performed a psychiatric evaluation and neurological exam on Appellant, and that Appellant demonstrated mild signs consistent with brain dysfunction, including central nervous system dysfunction. According to this expert, Appellant also demonstrated the typical signs of anti-social personality disorder or

psychopathy, and at the time of the crime, "you could argue" Appellant did not understand moral or legal right from wrong, as his brain could not process the events. In other words:

Based on the interview, the review of the records, the neurological evaluation, the brain-imaging evaluation, and the fact that he has received diagnoses of anti-social personality disorder ... and the—limitations or impairments that anti-socials or psychopaths have, one of the major ones they have is an appreciation for the wrongfulness, or the moral wrongfulness and legal wrongfulness of their actions at the time.

An expert in physiological psychology testified that Appellant suffered damage to the frontal lobe of his brain from two separate incidents. The first incident occurred during Appellant's birth when his brain received a reduced oxygen supply. The second incident occurred during Appellant's teen-age years when he received a blow to the back of his head from a beer bottle, driving his brain forward. Appellant presented psychiatric testimony that he had diminished or lowered function of his brain in the frontal lobe areas, and that there "could" be a causal connection between diminished function in the frontal lobe and mental illness. An expert in neuropsychology and neuroimaging testified that scans of the right hemisphere of Appellant's brain exhibited damage. According to this expert, the damage occurred in the medial gray matter of Appellant's brain at four standard deviations below normal, and an individual with this type of "extreme" damage would have some type of temporal lobe epilepsy. A medical doctor with expertise in Positron Imaging Tomography (P.E.T.) scans and neuropsychiatric disorder testified regarding the actual injury to Appellant's frontal lobe. This expert testified that the damaged lobe of Appellant's brain played an important role in impulse control, judgment, and empathy. In fact, he stated, "This abnormally low function or abnormality or injury would significantly compromise and impair an individual's ability to exercise judgment, impulse control, control of aggression."

The trial court in this case issued a jury instruction regarding both express and implied malice:

Malice aforethought could either be express or implied. Express malice is shown when a person speaks words which express hatred or ill-will for another, or when the person prepared beforehand to do the act which was later accomplished. Malice can be inferred from a conduct showing a total disregard for human life. Inferred malice may also arise when the deed is done with a deadly weapon.

Appellant's trial counsel took exception to the trial court's instruction, and argued that *Belcher* prevented an inferred malice charge, "[W]e would assert that, in this case, that insanity too is a self-defense, and we would think that the same rationale would apply to this case, and we would ask that charge be deleted, and they be so instructed, and that portion of that be deleted." The trial court overruled trial counsel's objection, and decided to include the objected-to portion of the charge:

I have read thoroughly *State [v.] Belcher*, [385 S.C. 597, 685 S.E.2d 802 (2009)] decided by the South Carolina Supreme Court in October—on October 12, 2009. I find nothing, absolutely nothing in the Supreme Court opinion that would so indicate—certainly doesn't direct, but even indicate, in any way, that it would be proper under these circumstances for the [c]ourt to charge—or delete that as far as the inference of malice. The Supreme Court didn't indicate that in the slightest. Now—so I respectfully decline to do that.

It is unclear what this Court could have included in *Belcher* to better indicate to the trial court the impropriety of an instruction that malice could be inferred from the use of a deadly weapon in this case. Appellant certainly presented evidence which could have reduced, mitigated, or excused the Victim's murder. The language of *Belcher* is clear, that when this type of evidence is submitted, an instruction regarding inferred malice from the use of a deadly weapon is improper. *See Belcher*, 385 S.C. at 612 n. 10, 685 S.E.2d at 810 n. 10 ("We overrule all cases involving a homicide or charge of assault and battery with intent to kill where two factors co-exist: (1) approval of the jury instruction that malice may be inferred from the use of a deadly weapon; and (2) evidence was presented that, if believed, would have reduced, mitigated, excused, or justified the homicide or the charged [assault and

battery with intent to kill.]") Thus, the trial court erred. However, we must determine whether that error requires reversal.

*Harmless Error*

 Errors, including erroneous jury instructions, are subject to a harmless error analysis. *Belcher*, 385 S.C. at 611, 685 S.E.2d at 809. Jury instructions should be considered as a whole, and if as a whole, they are free from error, any isolated portions which may be misleading do not constitute reversible error. *State v. Aleksey*, 343 S.C. 20, 27, 538 S.E.2d 248, 251 (2000).

In *Belcher*, we observed that often in murder cases there will be overwhelming evidence of malice, apart from the use of a deadly weapon. *Id.* at n. 8 ("In many, if not most, murder cases the [inferred malice from the use of a deadly weapon] charge will be harmless, even if couched in terms of a presumption. . . . Obviously[,] when a defendant walks into a store [and] shoots and robs the clerk, a charge that the jury may infer malice is not prejudicial to the defendant." (alteration in original)). The instant case is similar.

The State presented uncontested evidence that Appellant shot the Victim, his elderly and unarmed friend, in the back using a pillow as a silencer. Appellant then robbed the Victim, and for the next several days used his automobile to travel across the state, where he engaged in social activities and drinking. Authorities apprehended Appellant in possession of the Victim's vehicle and the gun used in the murder. Thus, the evidence of malice in this case is not limited to Appellant's use of a deadly weapon. *See Belcher*, 385 S.C. at 612, 685 S.E.2d at 810 ("It is entirely conceivable that the only evidence of malice was Belcher's use of a handgun.").

 Additionally, we must consider the jury instruction as a whole, and if as a whole the instruction is free from error, any isolated portions which may be misleading do not constitute reversible error. *Aleksey*, 343 S.C. at 27, 538 S.E.2d at 251. This Court will not reverse a trial court's decision regarding a jury instruction absent an abuse of discretion. *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000).

In the instant case, the trial court issued a jury instruction consistent with evidence presented by both the State and Appellant. The trial court charged the jury that they could return verdicts of not guilty, not guilty by reason of insanity, guilty but mentally ill, and guilty. Therefore, if the jury believed that Appellant could not distinguish moral or legal right from wrong, they could have found him not guilty by reason of insanity. In addition, the jury could have found that Appellant's mental disease or defect prevented him from conforming his conduct to the requirements of the law, regardless of whether he could make the necessary moral or legal distinctions. Nothing in the trial court's inferred malice charge would have prevented the jury from reaching either of these conclusions.

The trial court instructed the jury that inferred malice may arise when the "deed is done with a deadly weapon." The trial court also stated that malice "can be inferred from conduct showing total disregard for human life." Appellant only contests the "deadly weapon" language. However, if the jury rejected Appellant's insanity defense, which it did, the jury could also find that Appellant's conduct showed a total disregard for human life. Thus, Appellant could not have suffered prejudice from any separate inference that his use of a deadly weapon also gave rise to an inference of malice.

Therefore, although the trial court's charge in this case failed to comply with *Belcher*, this does not constitute reversible error.

## II. Trial Counsel's Conflict of Interest

Prior to this trial, a jury found Appellant guilty of a separate murder and recommended a sentence of death. *State v. Stanko,* 376 S.C. 571, 573, 658 S.E.2d 94, 95 (2008). William Diggs represented Appellant at that trial, and Appellant requested that Diggs represent him in the instant case, as well. However, Appellant also filed a post-conviction relief (PCR) application collaterally attacking Diggs's prior representation on the ground that he provided ineffective assistance of counsel. Appellant argues that this gave rise to a conflict of interest, and that the trial court erred in accepting Appellant's "inadequate" waiver of this conflict. We disagree.

On November 15, 2006, the trial court held a hearing to determine Appellant's representation in this case. Diggs stated at that hearing that he did not know of any reason that would preclude his availability for appointment. Appellant spoke at that hearing, expressing his satisfaction with Diggs's efforts in the prior trial and requesting Diggs represent him a second time:

So, what I'm saying to you is if you choose to appoint [Diggs] as counsel I have no problem with that and would greatly appreciate it actually.... I'm familiar with the law. I'm not an idiot to the law and I don't and would not raise any kind of argument concerning ... his representation.

On December 8, 2008, the PCR court held a hearing regarding Appellant's PCR application. At that hearing, Appellant explained his desire to proceed with a PCR application against Diggs, but at the same time retain his representation in the instant case:

The conundrum that I have is that: In the same sense, this [PCR] may have allegations of ineffective assistance of counsel against him. My argument is ... just because I feel he may have been ineffective in the first case does not mean that he'll make those same ineffective mistakes in the second; because he's learned from them, or may see them differently. So my conundrum is I don't want to lose him; because I believe in him. He knows my case. He's the one who had the test ordered and found out everything that was wrong with my medial frontal lobe. I don't want to lose him.

The trial court next conducted a hearing on March 4, 2009, to discuss the potential conflict arising from the PCR application and trial counsel's continued representation. The trial judge noted that the continued representation could be a "downright" disqualification of Diggs as trial counsel. However, Appellant explained that he filed the PCR application to "stop the death watch" after this Court turned down his direct appeal. Appellant insisted that the court allow him to retain Diggs as trial counsel:

I can't say, Your Honor, this is what I'm going to file, but if we play worst case scenario and I did file ineffective assistance of counsel against [Diggs] on any issues, understand-

ing the *Strickland* [*Strickland v. Washington*, 466 U.S. 668, 687–89, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] two-prong test, but that's still prerequisite that I wouldn't trust or believe in him to handle this case, (A) if he did commit errors that, let's say, he even determined as being errors, by looking at that case, I believe that [Diggs] would say, "Maybe I should have done this differently," and in this particular case, which is going use a very similar defense, wouldn't he have learned from that? (B) Even if I did file them, is it not a situation where it would have no effect on this case as long as I do trust and believe in him and his efforts toward this case?

The trial court responded by explicitly asking Appellant whether he wanted to retain Diggs:

The Court: If I understand you correctly that you want [Diggs] to remain as lead counsel and remain as one of your attorneys in this particular case?

Appellant: Yes.

Appellant continued an unprompted monologue requesting that Diggs represent him regardless of the pending PCR application:

[B]efore I jump away, I'm going to use an analogy. (A) There's a Solicitor that was in this case and that has been sanctioned by the State for previous misconducts [sic], but he is still a Solicitor. (B) I'm going to use a baseball analogy. If you have Derek Jeter, and in the ninth inning of the final game of the World Series he commits an error that costs the Yankees the game, that doesn't mean that you don't want him back starting next season, and I do. One thing about [Diggs] is he does believe in my case and he understands it's a very in-depth case concerning the defect in my brain, and I would ask—what I don't want to do is say, "Well, Your Honor, is the only way that I can keep [Diggs] is to say that I'm going to waive any [claim]?

To this the trial court responded: "No sir. I'm not asking you to do that." The trial court then asked Diggs whether he found any conflict in his continued representation of Appellant. Diggs responded that he did not, but that the trial court may want to revisit the issue if it appeared later that the PCR

theories and the theories used in the instant trial worked to undermine Appellant's case:

Based upon the—your statements to the Court, and the Court's questioning of [Appellant], [Appellant]'s statements to me, that I will keep [Diggs] as counsel here in this particular matter with the ability for the Court to re-visit in the future should there be any issues in the amended application that either gives the Court any concern, or [Appellant], or [Diggs] concerns as to [Diggs] continued representation in this matter.

On June 5, 2009, the trial court heard the State's Motion to Review Status of Counsel. The State took issue with what it believed to be an "apparent direct conflict of interest," based on the filing of Appellant's PCR application against Diggs. Diggs stated that he did not feel the PCR application had impacted his relationship with Appellant, his ability to communicate with him, or his ability to effectively represent him in any way. Appellant stated that he had the opportunity to confer with his PCR attorneys, but that nothing had changed regarding his desire to retain Diggs.

The trial court then engaged in a detailed colloquy with Appellant regarding the potential conflict:

The Court: Do you continue to want to have [Diggs] represent you in this action?

Appellant: Yes sir, I do.

The Court: All right sir, and do you feel that there is a free and open communication between you and [Diggs] despite the fact that the [PCR] application has been filed?

Appellant: Yes, sir, there is.

The Court: And you are able to fully discuss all issues that you deem necessary with him?

Appellant: Yes, sir.

The Court: All right sir, and have you found in any way that he is unresponsive to you or in any way … harboring any ill feelings to you because of the filing of the [PCR] application?

Appellant: Not only is he not now, but I do not believe that when we file the supplemental … there will be any problems at that time.

. . . .

Appellant: The issues that we're going to raise that have him in it have nothing to do with any issues that would create a conflict or any argument or I feel cause any communicative problems between [Diggs] and myself. They're more at trial situations that should have been objected to, things of that nature, and there is, there are two issues. But sir, I do not believe that [Diggs] and I are going to have any problems presenting the second trial.

Thus, the trial court concluded that Appellant "more than expressed" full and complete confidence in Diggs's abilities, and permitted Diggs to continue his representation of Appellant.

### A. Preservation

■ Appellant's argument that the trial court erred regarding an apparent conflict by his trial counsel is unpreserved. This Court has explained the rationale underlying issue preservation as follows:

The losing party must first try to convince the lower court it has ruled wrongly and then, if that effort fails, convince the appellate court that the lower court erred. This principle underlies the long-established preservation requirement that the losing party generally must both present his issues and arguments to the lower court and obtain a ruling before an appellate court will review those arguments.

. . . .

Imposing this preservation requirement on the appellant is meant to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments.

*I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 422, 526 S.E.2d 716, 724–25 (2000) (citing *Roche v. S.C. Alcoholic Beverage Control Comm'n,* 263 S.C. 451, 211 S.E.2d 243 (1975)). This explanation is especially pertinent to this case.

Appellant did not object to the appointment of Diggs as counsel, but instead emphatically requested that Diggs continue to represent him. Additionally, both the trial court and the PCR court questioned Appellant as to the wisdom of continuing with Diggs as trial counsel, and verified that Appellant had

no objections to this arrangement. Appellant never raised a single objection. Thus, he avoided the critical first step of preservation: convincing the trial court that it ruled incorrectly. Appellant cannot argue now on direct appeal that the trial court erred in acquiescing to his express and informed desire.

## B. *Waiver*

■ Even if Appellant had somehow preserved his arguments for our review, the trial court did not err. To the extent that this situation gave rise to a conflict of interest, implicating any constitutional right, Appellant was fully informed of that conflict. Appellant's extensive endorsement of Diggs's continued representation constituted a valid waiver. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). Appellant cannot now complain of an error which his own conduct induced. *See State v. Babb,* 299 S.C. 451, 455, 385 S.E.2d 827, 829 (1989) ("The record in this case clearly establishes that any shortage of time to prepare a defense was not the fault of the trial judge or the State, but rather the fault of [the defendant] in failing to act.").

Appellant's argument regarding trial counsel's alleged conflict is unpreserved. The lack of preservation notwithstanding, the Record demonstrates a knowing and intelligent waiver of any possible conflict.

## III. Juror Disqualification

Appellant argues that the trial court erred in refusing to disqualify a juror with prior knowledge of Appellant's unrelated crimes who stated unequivocally that she would vote to impose the death penalty in every instance in which the State proved an aggravating circumstance beyond a reasonable doubt. We disagree.

■ A prospective juror may be excluded for cause when his views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with instructions and his oath. *State v. Sapp,* 366

S.C. 283, 290–91, 621 S.E.2d 883, 886 (2005). When reviewing the trial court's qualification of prospective jurors, the responses of the challenged juror must be examined in light of the entire voir dire. *Id.* at 291, 621 S.E.2d at 886. The determination of whether a juror is qualified to serve in a capital case is within the sole discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the evidence. *Id.* A juror's disqualification will not be disturbed on appeal if there is a reasonable basis from which the trial court could have concluded that the juror would not have been able to faithfully discharge his responsibilities as a juror under the law. *Id.* at 291, 621 S.E.2d at 887.

### A. Prior knowledge

Juror # 480 stated during voir dire that she remembered that Appellant "murdered his girlfriend, and left the daughter for dead." She also stated she heard that following these crimes, Appellant "murdered a man in Conway." The trial court then asked Juror # 480 if she could leave her prior knowledge "outside the courtroom," and Juror # 480 indicated that she could:

> The Court: You are coming into the courtroom, you listen to all of the facts and evidence presented in this case, make your decision based on the facts and evidence in this case, the law the Court would give to you, and don't let anything that you think you might know about it in the past affect your decision in any way. You understand that?
>
> Juror # 480: Yes sir.
>
> The Court: Can you do that?
>
> Juror # 480: Yes sir.
>
> The Court: All right, Ma'am. Can you follow the law that the Court would give to you? Even if for some reason you didn't agree with it could you follow the law that the Court would give to you in this case?
>
> Juror # 480: Yes sir.
>
> The Court: All right, Ma'am. When you heard about this matter in the past do you remember forming any kind of opinion or belief at that point in time when you heard about it in the past?

Juror # 480: No sir. I really don't remember much about it, and just kind of wiped it out.

According to Appellant, Juror # 480's prior knowledge was the equivalent of placing improper character evidence and evidence of Appellant's prior death sentence before the jury. Appellant asserts, "If the solicitor in the present case brought up evidence of [Appellant's] prior crimes and death sentence [ ] during the guilt phase of this trial, it would have been grounds for a mistrial. There is no difference in seating a juror who knows this information from the outset. To believe the juror in this case did not convey this information to the other jurors, especially when she was not instructed otherwise, denies the frailty of human nature."

Appellant relies on *People v. Davis*, 97 Ill.2d 1, 72 Ill.Dec. 272, 452 N.E.2d 525 (1983), in support of his argument. However, *Davis* is inapplicable. In that case, an Illinois jury found Davis guilty of murder. *Id.* at 527. In a separate, bifurcated sentencing hearing, the jury unanimously determined that the necessary aggravating factors existed, and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. *Id.* Davis argued that the trial court erred in allowing the prosecution to inform the jury that he had received the death penalty for an unrelated murder. *Id.* at 536. To establish the aggravating factor that defendant had murdered two or more individuals, the State introduced certified copies of Davis's prior murder convictions. *Id.*

The Illinois Supreme Court reversed Davis's conviction. The court found that introduction of this evidence may have improperly influenced the jury in two respects. *Id.* at 537. First, if a juror had any uncertainty as to whether Davis qualified for the death sentence, the knowledge that twelve other people previously determined that he did could have swayed that decision. *Id.* Second, the jury's awareness of Davis's prior death sentence could diminish its sense of responsibility and mitigate the serious consequences of its decision. *Id.* Put another way, the jurors may have considered their own decision much less significant than they otherwise would. *Id.*

The facts of the instant case are markedly different from those of *Davis*. The State did not present evidence of Appel-

lant's prior death penalty conviction to the jury. Although the juror in this case admitted that she had prior knowledge of the conviction, the court established that Juror # 480 could place that prior knowledge aside and decide the case based solely on the evidence presented at trial.

Appellant's trial counsel also questioned Juror # 480 concerning her prior knowledge:

Diggs: Okay. And let's assume that's correct for a moment and you are selected to serve on this jury, would having knowledge about a prior death sentence undermine your ability to be responsible in terms of the—filling the juror responsibilities in this case, in other words, would you feel like we are just kind of going through the motions here for no good reason.

Juror # 480: No sir, because I think this is, what, an entirely different matter.

Juror # 480's unequivocal answers to the trial court's and trial counsel's questions prevent us from finding that the trial court's qualification of the juror was "wholly" unsupported by the evidence. The court in *Davis* reversed over concerns about the impact the introduction of a prior death sentence might have had on the jury. But here, Juror # 480's statements show a lack of clarity regarding Appellant's prior crimes, and there is nothing to suggest that knowledge of those crimes would have any bearing on her jury service. Thus, Appellant fails to demonstrate that Juror # 480's prior knowledge improperly affected the verdict, or that the trial court erred in concluding that Juror # 480 could faithfully discharge her responsibilities as a juror.

## B. *Predisposition*

 Appellant argues that the trial court erred in qualifying Juror # 480 because of the juror's unequivocal response that she would vote for death in every case where the State proved murder beyond a reasonable doubt, coupled with an aggravating circumstance proved beyond a reasonable doubt. Juror # 480's initial statements demonstrate a troubling likelihood that her view on this issue would have substantially impaired her performance as a juror. However, we find that the trial court sufficiently rehabilitated Juror # 480.

In *State v. Lindsey*, 372 S.C. 185, 642 S.E.2d 557 (2007), the Court analyzed the trial court's decision to disqualify a juror who expressed an equivocal view regarding the death penalty. In that case, the trial court asked Juror K if he could impose the death penalty. *Id.* at 190, 642 S.E.2d at 560. Juror K responded that he "didn't really know" if he could or not. *Id.* During subsequent voir dire by trial counsel, Juror K stated that he could listen to both sides in the penalty phase and render the most appropriate penalty, be that life imprisonment or death. *Id.* However, when questioned by the State, Juror K equivocated, and admitted that, in his view, life without parole was a more serious punishment than the death penalty. *Id.* at 190–91, 642 S.E.2d at 560. Juror K stated that regardless of the facts of a particular case, he would most likely choose life imprisonment as a punishment rather than death. *Id.* at 191, 641 S.E.2d at 560. The trial court found that Juror K's views on the death penalty would substantially impair his ability to follow the law as instructed. *Id.* at 192, 642 S.E.2d at 561 ("He further noted that when asked about giving the death penalty, Juror K 'took a very big deep [breath] and exhaled as if he were very uncertain as to whether or not he could do that.'"). This Court found that Juror K's equivocal views and noted hesitation provided a reasonable basis for the trial court's conclusion. *Id.* at 193, 642 S.E.2d at 561 ("Considering the voir dire as a whole, we find the trial judge did not abuse his discretion in excusing the juror.")

In *State v. Green*, 301 S.C. 347, 392 S.E.2d 157 (1990), the defendant argued that two jurors should have been disqualified because their responses during voir dire indicated a predisposition towards the death penalty. This Court held that the "ultimate consideration is that the juror be unbiased, impartial and able to carry out the law as it is explained to him." *Id.* at 354, 392 S.E.2d at 161. Despite one juror's disconcerting responses, the juror indicated she would wait until she had been presented with the "entire picture." *Id.* In addition, the juror expressed a willingness to "follow the law," and a respect for mitigating circumstances. *Id.* Thus, the Court concluded that the trial court did not abuse its discretion in qualifying the juror. *Id.* (finding that the other juror

was an alternate and any error in seating that juror would be harmless beyond a reasonable doubt).

Appellant's trial counsel questioned Juror # 480 regarding her ability to consider life imprisonment without parole even if the State proved murder and an aggravating circumstance beyond a reasonable doubt:

Diggs: I want you to tell me, once you are on the jury, and you have concluded that there was guilt beyond a reasonable doubt, and then we move into the sentencing phase, and the State begins to present evidence of an aggravating circumstance, which is what the Judge is going to tell you they are required to do in order to ask for a death sentence, okay, and then we get to the end of that hearing and you believe the State did, indeed, present evidence in this case of an aggravating circumstance, coupled with murder, would you be predisposed in that situation to vote death as opposed to life imprisonment?

Juror # 480: Yes sir.

Diggs: Okay. And would you do that—without knowing specific facts would it be fair to say you would be in that position in every case?

Juror # 480: Well, that's where you said specific facts.

Diggs: Yes Ma'am. Without any specific facts, just that foundation, that two-tiered foundation, so to speak, murder you found beyond a reasonable doubt, and then on top of that an aggravating circumstance beyond a reasonable doubt, you would—in every case where those two factors were combined, would vote death?

Juror # 480: Yes sir.

Following this exchange the trial court questioned Juror # 480. The trial court explained to Juror # 480 that just because an aggravating circumstance is found, this does not mean that the jury automatically recommends a sentence of death. Juror # 480 answered that she could vote to impose life imprisonment or death if the State proved an aggravating circumstance beyond a reasonable doubt. Juror # 480 also stated that she understood that the jury could not even consider the death penalty if the State failed to prove an aggravating circumstance. Juror # 480 answered affirmative-

ly that she could follow the trial court's instruction and apply the law to facts of the case.

This Court's decisions in *Green* and *Lindsey* lead us to the conclusion that the trial court did not err in this case. During trial counsel's voir dire, Juror # 480 stated that she would always vote to impose the death penalty when murder and a statutory aggravating circumstance were proven beyond a reasonable doubt. However, within that same colloquy she stated that she could consider all of the evidence in the case and render any one of the four verdicts she felt was best supported by the evidence. Moreover, Juror # 480 responded to the trial court's methodical questioning with an affirmative response that she could in fact consider life imprisonment and the death penalty equally only if the State proved the requisite statutory aggravating circumstance. Ultimately, there is evidence in the Record to support the trial court's decision to qualify Juror # 480. Her answers on the whole demonstrate an ability and willingness to be impartial and carry out the law as explained to her. Although Juror # 480 gave two contradictory answers during voir dire, the overall balance of her answers does not demonstrate the type of equivocation evident in *Lindsey*.

## IV. Refusal to Grant Change of Venue

As referenced in Issue II, a jury in neighboring Georgetown County convicted Appellant of murder, and recommended death, prior to the trial of the instant case. Of the one hundred and twelve potential jurors questioned by the trial court, fifty-six knew about Appellant through pretrial publicity. According to Appellant, of the forty-five qualified jurors, twenty-seven knew about Appellant's previous trial, conviction, and death sentence. Of the seated jurors, at least eight knew the Appellant by name, and as discussed previously, Juror # 480 knew of his prior conviction and sentence. Based on these facts, Appellant argues that the trial court erred in refusing to grant a change of venue. We disagree.

A motion to change venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *Sheppard v. State*, 357 S.C. 646, 654, 594 S.E.2d 462, 467 (2004). When a trial judge

bases the denial of a motion for a change of venue because of pretrial publicity upon an adequate voir dire examination of the jurors, his decision will not be disturbed absent extraordinary circumstances. *State v. Caldwell*, 300 S.C. 494, 502, 388 S.E.2d 816, 821 (1990), *overruled on other grounds by State v. Evans*, 371 S.C. 27, 30, 637 S.E.2d 313, 315 (2006). A denial of a change of venue is not error if the jurors are found to have the ability to set aside any impressions or opinions and render a verdict based on the evidence presented at trial. *State v. Tucker*, 334 S.C. 1, 14, 512 S.E.2d 99, 106 (1999). It is the defendant's burden to demonstrate actual juror prejudice as a result of pretrial publicity. *Caldwell*, 300 S.C. at 494, 388 S.E.2d at 816.

In *State v. Evins*, 373 S.C. 404, 645 S.E.2d 904 (2007), the defendant requested a change of venue due to pre-trial publicity regarding his connection to two murders. In September 2002, the body of a woman was found in Spartanburg. *Id.* at 411, 645 S.E.2d at 907. The victim had been strangled, and the crime went unsolved until the defendant's arrest for a February 2003 murder. *Id.* Subsequently, an investigation revealed that semen found on the victim's body matched the defendant's DNA. *Id.*

Trial counsel moved for a change of venue, noting that thirty-nine members of the sixty-eight person jury pool had heard something about the case, and seven of the twelve jurors seated had some knowledge of the case. *Id.* at 412, 645 S.E.2d at 907–08. The trial court concluded that all jurors who had any prior knowledge of the case indicated they could set aside any information, and denied trial counsel's motion. *Id.* at 412, 645 S.E.2d at 908.

In reviewing Evins's appeal, this Court found the United States Supreme Court's decision in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), instructive. In that case, the people of Calcasieu Parish in Lake Charles, Louisiana, were "exposed repeatedly and in depth to the spectacle of the defendant personally confessing in detail to the crimes for which he was later charged." *Id.* at 726, 83 S.Ct. 1417. In addition, three members of the jury had watched the defendant's televised "interview" in which he confessed to the sheriff, and two members of the jury were

"honorary" deputy sheriffs themselves. *Id.* at 725, 83 S.Ct. 1417. The failure to change venue in that case compromised the defendant's due process rights. *Id.* at 727, 83 S.Ct. 1417.

Clearly the facts of the instant case are more similar to those of *Evins* than of *Rideau.* In denying Appellant's change of venue motion, the trial court concluded that the vast majority of the jurors knew nothing about the case:

> A few of them know [Appellant's] name. That's on the questionnaire they were given..... It's no kind of pretrial publicity of any kind. And the one person that said they had some kind of information, again, without equivocation of any kind, indicated that they could set it aside.

This finding is similar to the trial court's conclusion in *Evins* that all members of the jury with any knowledge of the murder due to pretrial publicity indicated they could set that knowledge aside. *Evins,* 373 S.C. at 413, 645 S.E.2d at 908. Interestingly, the defendant in *Evins,* as here, seized on statements by one juror that she had read about his prior crimes, and overstated the juror's knowledge:

> The juror testified on voir dire that the only thing she heard was that the crime had taken place; she specifically testified that she knew no details, did not know the location, she had formed no opinion, could put aside what she had heard, and could be fair and impartial.

*Id.*

In the instant case, Appellant fails to present even one juror who stated he or she could not ignore exposure to pretrial publicity prior to serving as a juror. In the case of Juror # 480, she did not claim to know specific details of the instant case or Appellant's prior conviction, and stated that she could be fair and impartial. Appellant advances broad and unsupported arguments regarding the publicity of this case, but fails to meet his burden of demonstrating actual juror prejudice as a result of that publicity. *See Sheppard,* 357 S.C. at 655, 594 S.E.2d at 468 ("Mere exposure to pretrial publicity does not automatically disqualify a prospective juror. Instead the relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant."). The Record does not support a finding that the trial court ignored

actual juror prejudice related to pretrial publicity, and thus, the trial court did not abuse its discretion in denying Appellant's motion to change venue.

## V. Juror Opt Out

Appellant asserts that the trial court erred in excusing eighty-five perspective jurors pursuant to section 14–7–840 of the South Carolina Code. Section 14–7–840 allows any person age sixty-five or over to avoid jury service. S.C.Code Ann. § 14–7–840 (Supp.2011). Appellant argues that allowing these individuals an exemption from jury service violates the "fair cross-section" requirement of the Sixth Amendment to the United States Constitution. We disagree.

The Sixth Amendment requires that a person charged with a crime be able to draw from a fair cross-section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To establish a prima facie violation of the fair cross-section requirement, a defendant must show that (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in the venire from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). A "distinctive" group has been defined as one that: (1) shows a quality or attribute that defines or limits membership in the group; (2) possesses a cohesiveness of ideas, attitudes, or experiences that distinguishes the purported group from the rest of society; and (3) shares a community of interest that may not be represented in other segments of the population. *State v. Price,* 301 N.C. 437, 272 S.E.2d 103, 109 (1980).

Section 14–7–840 of the South Carolina Code provides:

No person is exempt from service as a juror in any court of this State **except** men and women sixty-five years of age or over. Notaries public are not considered state officers and are not exempt under this section. A person exempt under this section may be excused upon telephone confirmation of date of birth and age to the clerk of court or the chief

magistrate. The jury commissioners shall not excuse or disqualify a juror under this section. The clerk of court shall maintain a list of persons excused by the court and the reasons the juror was determined to be excused.

S.C.Code Ann. § 14–7–840 (Supp.2011) (emphasis added).

In the instant case, the trial court excused eighty-five prospective jurors who chose to take advantage of their statutory exemption. Trial counsel objected on the grounds that "sixty-five is not what sixty-five used to be," and that section 14–7–840 was unconstitutional. The trial court rejected trial counsel's argument, and excused the jurors.

In *Duren*, the United States Supreme Court explained the test that must be performed in analyzing an alleged violation of the fair cross-section requirement. In that case, a jury convicted Duren of first degree murder and armed robbery. *Duren*, 439 U.S. at 360, 99 S.Ct. 664. At the time of trial, Missouri law granted women, who so requested, an automatic exemption from jury service. *Id.* (citing M.Rev.Stat. § 494.031(2) (Supp.1978)). Duren contended that this law violated his right to a trial by a jury chosen from a cross-section of his community. *Id.* The Supreme Court agreed.

First, the Supreme Court held that (1) women were sufficiently numerous and distinct from men, and if they were systematically eliminated from jury panels, the Sixth Amendment's cross-section requirement could not be satisfied. *Id.* at 364, 99 S.Ct. 664 (citing *Taylor v. Louisiana*, 419 U.S. 522, 531, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)). Second, the Court noted Duren's statistical evidence that women constituted fifty-four percent of the community, but jury venires contained approximately fifteen percent women. *Id.* at 365–66, 99 S.Ct. 664. The Supreme Court found that these venires were not "reasonably representative" of the community, and such a gross discrepancy between the percentages of women in the community and those participating in jury service mandated the conclusion that women were not fairly represented in the source from which juries were drawn in the community. *Id.* at 366, 99 S.Ct. 664. Finally, Duren demonstrated that this large discrepancy occurred in every weekly venire for nearly a year. *Id.* The Supreme Court agreed that this indicated that

the cause of the underrepresentation was systematic. *Id.* at 367, 99 S.Ct. 664.

Appellant cannot establish a prima facie case under the *Duren* test. There is no evidence before this Court that persons age sixty-five or over are "distinctive." Appellant states that a community of persons aged sixty-five or older are significantly different than a community comprised of all citizens, and that this particular group of citizens holds the same generational values and experiences, and lived through some of the same major world and national events. However, Appellant fails to cite any authority for the proposition that having lived through the same major events would yield monolithic values and experiences. Persons aged sixty-five or older obviously share a quality that limits membership in the group, but Appellant cannot demonstrate that this group as a whole possesses a cohesiveness of ideas, attitudes, or experiences that distinguishes them from the rest of society, or that these persons share a community of interest not represented in other segments of the population. *See Price*, 272 S.E.2d at 109 (outlining the definition of a distinctive group).

Additionally, Appellant fails to present any statistical evidence that the percentage of persons aged sixty-five years or older who participate in jury selection is not a reasonable representation of the community, or that any alleged underrepresentation is due to systematic exclusion of the group in the jury selection process. Thus, there is no basis for a conclusion that the trial court's excusal of potential jurors pursuant to section 14–7–840 of the South Carolina Code violated his constitutional right to a jury constituting a fair cross-section of the community.

In addition, based on the preceding analysis, we take this opportunity to hold that, for the purposes of section 14–7–480, persons age sixty-five or older are not a distinctive group. *See, e.g., Brewer v. Nix*, 963 F.2d 1111, 1112–13 (8th Cir.1992) ("We conclude that this falls far short of proving the type of distinctive group required for a prima facie case under *Duren.* The age parameters of the group are too arbitrary, and its supposed distinctive characteristics are too general and ill-defined, to satisfy the *Duren* standards.") (holding that Iowa law exempting persons sixty-five or older from jury service

did not violate the Sixth Amendment); *Silagy v. Peters,* 905 F.2d 986, 1010–11 (7th Cir.1990) (holding that persons seventy years of age or older did not constitute a "distinctive" group for purposes of the Sixth Amendment); *United States v. Lynch,* 792 F.2d 269, 271–72 (1st Cir.1986) ("None of this evidence, however, undercuts our decision in *Barber,* [*Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985) ] that persons age 18 to 34 do not sufficiently blend into one 'cognizable group' so as to permit the making of a prima facie case of juror discrimination simply by showing that the venire underrepresents persons falling within the broad spectrum of those ages."); *State v. Rogers,* 355 N.C. 420, 562 S.E.2d 859, 876–78 (2002) (holding that citizens aged sixty-five or over do not constitute a distinctive group for purposes of the Sixth Amendment); *Commonwealth v. Bastarache,* 382 Mass. 86, 414 N.E.2d 984, 992 n. 10 (1980) ("Classifications based on age have been rejected as an 'identifiable group' (for equal protection purposes) or as a 'distinctive' group (for Sixth Amendment purposes) in virtually every Federal case that has dealt with the question.").

## VI. Cruel and Unusual Punishment

 Appellant argues that the trial court erred in ruling that his execution would not violate the Eighth Amendment to the Constitution. We disagree.

 Capital punishment must be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them "the most deserving of execution." *Roper v. Simmons,* 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (citation omitted). There are a number of crimes that beyond question are severe, yet the death penalty may not be imposed for their commission. *See, e.g., Coker v. Georgia,* 433 U.S. 584, 598, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) ("We have the abiding conviction that the death penalty ... is an excessive penalty for the rapist who, as such, does not take human life.") (citation omitted); *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding that the death penalty may not be applied to a defendant who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed).

The Eighth Amendment's prohibition against cruel and unusual punishment is viewed through the "evolving standards of decency that mark the progress of a maturing society." *Roper*, 543 U.S. at 560–61, 125 S.Ct. 1183 (citing *Trop v. Dulles*, 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). These evolving standards prohibit the execution of the juvenile defendants and the intellectually disabled.[1] *See Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 ("Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a [intellectually disabled] offender."); *Roper*, 543 U.S. at 575, 125 S.Ct. 1183 ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."). Section 44–20–30 of the South Carolina Code defines an intellectual disability as "significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." S.C.Code Ann. § 44–20–30 (Supp.2011). In *Franklin v. Maynard*, 356 S.C. 276, 278–79, 588 S.E.2d 604, 605 (2003), this Court approved this statutory definition as applicable to the death penalty context.

The threshold determination in this analysis is whether Appellant's alleged mental condition places him within the class of offender that may not executed. As discussed in Issue I, *supra*, Appellant presented expert testimony, as part of an insanity defense, that he suffered from central nervous

---

1. *See* Act of October 5, 2010 (Rosa's Law), Pub.L. No. 111–256, 124 Stat 2643 (2010), codified at 20 U.S.C. § 1400 *et seq* ("(1) a reference to 'an intellectual disability' shall mean a condition previously referred to as 'mental retardation,' or a variation of this term, and shall have the same meaning with respect to programs, or qualifications for programs, for individuals with such a condition; and (2) a reference to individuals with intellectual disabilities shall mean individuals who were previously referred to as individuals who are 'individuals with mental retardation' or 'the mentally retarded,' or variations of those terms."); *see also* S.C.Code Ann. § 44–20–30 (Supp.2011), *amended by* 2011 Act No. 47, § 13 (2011) ("SECTION 13. In Sections 1 through 6 of this act, the terms 'intellectual disability' and 'person with intellectual disability' have replaced and have the same meanings as the former terms 'mental retardation' and 'mentally retarded.' ").

system dysfunction and diminished or lowered function of his brain in the frontal lobe area. In addition, one of Appellant's experts testified that scans of the right hemisphere of Appellant's brain exhibited damage in the medial gray matter of Appellant's brain at four standard deviations below normal. The expert testified that this type of damage is not seen in "normal" people, and an individual with this type of "extreme" damage would have some type of temporal lobe epilepsy.

However, the State presented compelling counter testimony. An expert in Forensic Psychology testified that she conducted a detailed review of Appellant's personal and criminal history and interviewed Appellant for approximately seventeen hours. The expert diagnosed Appellant as having a severe personality disorder. She pointed out in her testimony that evidence of mental disease or defect manifested only by repeated criminal or other anti-social conduct is not sufficient to establish the defense of insanity. The expert's description of Appellant does not depict an intellectually disabled individual:

I think he's a highly narcissistic, entitled person, who really feels special. I think he, throughout his life, has not really wanted to work very hard, so he's done a lot of illegal activities for quick gain. He's a very, very smart person, but I would say that, rather than applying himself ... he would look for the fast deal.... Why he doesn't have a conscience, I don't know. I don't think anybody can tell you why he doesn't have a conscience.

An expert in neurology and neuropsychiatry testified that the white matter damage and prefrontal atrophy claimed by Appellant's experts was simply "not there." Moreover, the expert testified directly to the possible occurrence of brain damage during Appellant's birth. According to that expert's review of Appellant's medical records, Appellant received the maximum ten points in the Apgar test given to newborns almost immediately following birth. A diagnostic imager provided expert testimony that the images of Appellant's brain demonstrated no abnormalities and were "perfectly normal." This expert's testimony regarding Appellant's brain scan is illuminating. The expert explained the usual procedure of a P.E.T. scan, and how Appellant's scan differed from that procedure. According to this expert's testimony, patients are normally placed in a controlled environment for approximately

one hour prior to the scan. This sequestration ensures a standard brain scan by preventing, as much as possible, exposure to external stimuli. However, in Appellant's case, his trial counsel altered the standard pre-scan routine. Appellant's trial counsel arranged for a psychologist to administer a computer-generated test to Appellant both before and during the pre-scan routine. This test required Appellant to sit in front of a computer screen and click a mouse in response to "yes" or "no" questions. This caused certain areas of Appellant's brain to appear irregular. However, when the expert accounted for the disruption to the pre-scan routine, Appellant's scan appeared normal.

Appellant has an intelligence quotient of 143, and a history of criminal behavior consistent with that of a confidence man. Moreover, Appellant's trial counsel admitted there was no definitive evidence of an intellectual disability, stating, "Your honor, hypofrontality is what *some* experts say is the condition this defendant has." While expert testimony in this case may demonstrate Appellant's inability to adapt, the Record does not show that he is of significant sub-average intellectual functioning.

However, Appellant's trial counsel argued that preventing the State from executing individuals with Appellant's alleged brain dysfunction simply represented a logical step in Eighth Amendment jurisprudence:

> It should be declared unconstitutional and say, "Look, we've taken the step in terms of [intellectual disability]. We've taken the step in terms of age, recognizing that the brain has got to function properly, and in those two cases, the [intellectual disability] and the young age, it doesn't, so we're not going to execute those people," and we shouldn't.

Appellant renews that argument in asking this Court to expand the United States Supreme Court's rationale in prohibiting execution as a punishment for certain offenders. However, trial counsel's argument oversimplifies the underlying reasoning for the Eighth Amendment prohibition on executing juveniles and the intellectually disabled.

In *Roper*, the Supreme Court articulated three differences between juveniles and adults which demonstrate that juveniles cannot reliably be classified as among the worst offend-

ers. *Id.* at 569, 125 S.Ct. 1183. First, scientific and sociological evidence demonstrates that a "lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young." *Id.* (citation omitted). This often results in impetuous and ill-considered actions and decisions. *Id.* ("[A]dolescents are overrepresented statistically in virtually every category of reckless behavior." (citation omitted)). Second, juveniles are more vulnerable to negative influences and outside pressures. *Id.* ("This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment." (citation omitted)). Third, the character of a juvenile is not as well informed as that of an adult. *Id.* at 570, 125 S.Ct. 1183 ("The personality traits of juveniles are more transitory, less fixed." (citation omitted)). In addition, according to the Supreme Court, the two distinct social purposes served by the death penalty, retribution and deterrence, are not served by a minor's execution. *Id.* at 571, 125 S.Ct. 1183 ("Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity."). The Court also cited the glaring fact that at the time of the decision, the United States stood alone as the only country in the world that continued to officially sanction the juvenile death penalty. *Id.* at 575, 125 S.Ct. 1183.

In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court relied on a clinical definition of intellectual disability which required not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that manifested before age eighteen. *Id.* at 318, 122 S.Ct. 2242. Contrary to trial counsel's assertion in the instant case, the Supreme Court's decision did not rely on a *simple* finding that an intellectually disabled defendant's brain did not function properly. The Supreme Court found that these persons frequently know the difference between right and wrong and are competent to stand trial. *Id.* However, their diminished capacity frustrated the retributive and deterrent goals of capital punishment. *Id.*

Following the resumption of the death penalty, the Supreme Court maintained that the punishment applied only to the most serious crimes. *Id.* at 319, 122 S.Ct. 2242. Thus, the Court reasoned that if the "culpability of the average murderer is often insufficient to justify the most extreme sanction available to the State[,] the lesser culpability of the [intellectually disabled] offender surely does not merit that form of retribution." *Id.* ("Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the [intellectually disabled] is appropriate."). With respect to deterrence, the Court had previously held that capital punishment could only serve as a deterrent when murder "is the result of premeditation and deliberation." *Id.* (citation omitted). The Court held that this sort of calculation stood at the opposite end of the spectrum from the behavior of the intellectually disabled. *Id.* at 319–20, 122 S.Ct. 2242. In addition, this disability was also found to increase the risk that the death penalty would be imposed in spite of factors which may call for a less severe penalty. *Id.* at 320, 122 S.Ct. 2242. More specifically, these defendants are more susceptible to false confessions, are less able to provide meaningful assistance to their counsel, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. *Id.* at 320–21, 122 S.Ct. 2242.

Appellant's alleged mental abnormalities do not demonstrate an inability to communicate or care for himself adequately, or sub-average intellectual functioning. Instead, his above average intelligence, and behavior before and after the Victim's murder, demonstrate an ability to formulate and execute deliberate plans. *See Enmund v. Florida,* 458 U.S. 782, 799, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding that capital punishment can only serve as deterrent when murder is the result of premeditation and deliberation). Thus, his behavior in this case stands at the opposite end of the spectrum from the behavior of an intellectually disabled person. *See Atkins,* 536 U.S. at 319–20, 122 S.Ct. 2242 (analyzing the mental capabilities of intellectually disabled offenders). There is simply no justification for finding Appellant's alleged condition similar to those individuals who may not be executed

lawfully.[2]

The trial court properly denied Appellant's motion pursuant to existing law, and did not err in refusing to find that Appellant's death sentence violates the Eighth Amendment.

## CONCLUSION

For the foregoing reasons, we affirm Appellant's conviction and sentence.

BEATTY, KITTREDGE, and HEARN, JJ., concur.
PLEICONES, J. concurs in result only.

---

2. The decisions by other jurisdictions cited by Appellant are not persuasive. For example, the Florida Supreme Court has reversed death penalty convictions based on mental illnesses whose symptoms do not align closely with our state's definition of intellectual disability. However, even those cases involve debilitating mental illnesses of the type inapposite that of Appellant.